WILLIAM WADDINGHAM, Respondent, v. PAULINA WAD-
DINGHAM, Appellant.

Kansas City Court of Appeals, April 19, 1886.

1. EVIDENCE—PRESUMPTIONS—MAY BE REBUTTED BY A CONTRARY ONE.
A presumption may be rebutted by a contrary and stronger pre-
sumption. Where there are conflicting presumptions, the presump-
tion of innocence will prevail against the presumption of continuance
of life; the presumption of the continuance of things generally; the
presumption of marriage, and the presumption of chastity. And
where, as in this case, there are two presumptions, one of marriage
and the other of innocence of the crime of bigamy, the presumption
of innocence arises, notwithstanding the trial is not for the crime.

2. ———DIVORCE—PRIOR MARRIAGE—PROOF OF TO INVALIDATE SECOND
MARRIAGE.—The conclusion is inevitable, from the adjudicated cases,
as well as standard text writers, that in order to invalidate a sec-
ond marriage formally entered into and proven in actual fact, there
must be actual, as distinguished from presumptive proof, of the
first marriage.

3. CASE ADJUDGED.—After a patient and painstaking investigation, and
a careful review of the evidence, as presented in the record, as well
as of the law applicable to it, the court *holds:* That the defend-
ant is the injured party in the proceeding, and that she is entitled to
a divorce from plaintiff for his fault.

APPEAL from Audrain Circuit Court, HON. ELIJAH
ROBINSON, Judge.

*Reversed and remanded with directions.*

The case and facts are stated in the opinion of the
court.

W. W. FRY, for the appellant.

I.   The weight of the evidence is entirely with the
appellant.   The only evidence of alleged marriage with
Gavin is presumptive evidence from uncertain represen-
tations and cohabitation, illicit in character, for a brief

time, thirty years ago, and, giving force to the evidence, the *weight of evidence is with* appellant.

II.    Like, as if charged with the crime of bigamy, appellant here is presumed innocent. That is, the presumption is in favor of the last marriage, and *sustains* it, and the cohabitation and relation of appellant and Gavin (even if satisfactorily proven, as it is not), is presumed to have been concubinage, in *favor of appellant* and *every presumption* sustains the present marriage with respondent, until the contrary is proved beyond a reasonable doubt. *Clayton v. Wardell*, 4 N. Y. 230; *O'Bryan v. O'Bryan*, 13 Mo. 19; *Klein v. Landman*, 29 Mo. 259; *Armstrong v. Hodges*, 2 B. Mon. (Ky.) 70; 2 Greenl. Evid., sect. 49; *Case v. Case*, 17 Cal. 598. A fact must be established by the same evidence, whether it is to be followed by a criminal or civil consequence. *Lord Mellville's Case*, 29 Howell's State Trials, 549 and 764; Lawson on Presumptive Evid. 436; Bish. Crim. Proced., sect. 1046. In cases of *conflicting* presumptions on the subject of marriage, that in favor of *innocence* must prevail. Tyler on Infancy and Coralem, sects. 641 and 617, and cases; *Sensor v. Bower*, 1 Penn. and W. R. 450. The presumption of *innocence* will prevail against the presumption of *life*, the presumption of *marriage*, the presumption of *chastity*. Lawson on Presumptive Evidence, 447–452, and cases cited.

III.    After positive proof of marriage *de facto* with respondent the law will *not presume a former* marriage from proof of *cohabitation* and *representations*, but requires *positive*, *direct* proof of such former marriage before the latter will be annulled. *Harris v. Harris*, 8 Brad. Surr. N. Y. 57; *Chapman v. Cooper*, 5 Rich. (S. C.) 452; *Chamberlain v. Chamberlain*, 71 N. Y. 423; *Klein v. Landman*, 29 Mo. 259; *Jones v. Jones*, 45 Md. 144; *Hirtchens v. Kimmel*, 31 Mich. 126; *Case v. Case*, 17 Cal. 598; 2 Greenl. Evid. (1 Ed.) sect. 461.

IV.    *Traditionary* and *hearsay* evidence to prove a marriage is never received *except from necessity*, and is

only *prima facie* evidence at best. *Chamberlain v. Chamberlain,* 71 N. Y. 423. If the actual fact of a marriage is proved, as introducing *either one* of two cohabitations, it will not be invalidated by the evidence of another cohabitation. 1 Bishop Marr. and Div. (6 Ed.) sect. 442–446; *Ib.* sects. 272–274.

· V. Cohabitation and reputation are, at best, only *presumptive* proof of marriage, and the absence of either destroys even that proof. No matrimonial cohabitation has, in this case, been proven, nor reputation in the family of either party, or among people who had an opportunity to know, nor of the mode of life for the past thirty years, such as would furnish even presumptive proof of marriage. *Cargile v. Wood,* 63 Mo. 501; *Blackburn v. Crawford,* 3 Wallace (N. S.) 175; *Klein v. Landman,* 29 Mo. 259.

VI. Whatever proof of cohabitation there is in the case is illicit, and such, even if suspiciously illicit, will not be taken as proof of marriage, *even though* the parties *held themselves out* as husband and wife, but the law will require proof of *actual marriage. Blackburn v. Crawford,* 3 Wallace (N. S.) 176. Under such circumstances the law makes no presumption. Without concomitant facts, an irregular cohabitation and the parties' reputation are of no avail to prove a marriage. *Cargile v. Wood,* 63 Mo. 501; *Johnson v. Johnson,* 1 Dessans 595; 1 Bishop on Marr. and Div. (6 Ed.) sects. 268–276.

VII. Where marriage is inferred from cohabitation, the presumption may be destroyed by subsequent and long continued separation of the parties. The separation in this case has been forty years. 2 Greenl. Evid. (4 Ed.) sect. 464; *Yardley's Estate,* 75 Pa. St. 207; *Williams v. Williams,* 46 Wis. 464.

VIII. In nullity suits on charge of a former marriage, the proof of such former marriage should be *primary* evidence, and the admissibility, if secondary, is very doubtful. And admission of husband of former

marriage is not competent. Bishop on Marr. and Div. (6 Ed.) sect. 265; *Patterson v. Gaines*, 6 Harr. (N. S.) 550; *Gaines v. Relf*, 12 Harr. (N. S.) 472.

W. O. Forrist, also, for the appellant.

I.  The *gist* of plaintiff's action is the existence of a former *legal* marriage. Such must be shown by direct and primary evidence alone. Roscoe Crim. Evid., sect. 316; *Langtry v. State*, 30 Ala. 536; Wharton Crim. Evid. (8 Ed.) sect. 171; 2 Bishop Marr. and Divorce (6 Ed.) sects. 270, 265, 269. The same rule applies in proceedings for divorce as in criminal proceedings. 2 Bishop Marr. and Div. (6 Ed.) sects. 265, 270.

II.  The general rule that in actions of this nature the marriage may be inferred from the *cohabitation* of the parties, is not applicable here. In the absence of criminative proof, it is never to be supposed, as a matter of *legal presumption*, that a person has violated the criminal law; and the presumption in favor of innocence is not confined to proceedings instituted with a view of punishing the offence, but holds in all suits where it comes collaterally in question. *Case v. Case*, 17 Cal. 598; *Fuller v. Fuller*, *Ib.* 665. Besides, the presumption arising from cohabitation, etc., is met by a like and stronger presumption arising from the cohabitation, etc., under the *second* marriage, and hence the presumption of innocence must prevail.

III.  There was no legal proof of the alleged prior marriage. Mere living together for any length of time, however great, as *man and woman*, is not cohabitation within the rule. The living together must be as *husband and wife*. Tyler on Infancy and Coverture, sect. 640. And cohabitation and reputation must both exist before even the presumption can be raised. *Cargile v. Wood*, 63 Mo. 12; *Ib.* 572.

W. H. KENNAN and MACFARLANE & TRIMBLE, for the respondent.

I.   By the laws of both Missouri and Michigan marriage is regarded as a civil contract, so far as validity in law is concerned.   Rev. Stat. Mich. (1846) sect. 2, ch. 83; Rev. Stat. Mo. 1855, sect. 1, ch. 108, and so in the subsequent and prior revisions from 1835 to 1879 inclusive. *Dyer v. Brannock*, 66 Mo. 391; *Brinkly v. Brinkly*, 50 N. Y. 184.

II.   The evidence introduced proving cohabitation of defendant with Gavin as man and wife, their reputation as such among their neighbors, their conduct and acknowledgments, their reception in their respective families as man and wife, and the declaration or admission of defendant, *was admissible*, and sufficient to prove her former marriage with Gavin.   And neither record evidence, nor testimony of witnesses present at the nuptials was necessary.   *Northfield v. Veershire*, 33 Vt. 112; *Morndell v. Morrison*, 25 Pa. St. 327; *Donnelly v. Donnelly*, 8 B. Mon. (Ky.) 113; *Formshill v. Murray*, 1 Bland Ch. (Md.) 479; *Clayton v. Wardell*, 4 Comstock (N. Y.) 243; *State v. Libby*, 44 Maine 428; *Williams v. State*, 54 Ala. 132; *O' Neale v. Commonwealth*, 17 Gratt. (Va.) 582; *Squire v. State*, 46 Ind. 459; *State v. McDonald*, 25 Mo. 174; *State v. Meyer*, 13 Mo. App. 596.

III.   There is no *evidence* in this case tending to show that the cohabitation of Gavin and defendant was illicit in its origin, so the cases cited are not applicable.

IV.   Prior marriage, undissolved, is a civil disability which prevents any *subsequent* union during the life of both parties, and renders such second marriage absolutely void *ab initio*.   1 Bishop Marr. and Div. ch. 15; *Ibid*, sect. 105; 3 Phillips on Evid. (4 Am. Ed.) 568; Tyler on Infancy and Coverture, sect. 638; sect. 3266, Revised Statutes.   Therefore, if the marriage between the plaintiff and defendant be void, by reason of a prior marriage, then no marital rights accrued to, and no marital ob-

ligations were imposed upon, either party. The marriage *would be void.* 2 Bishop on Marr. and Div. sects. 690, 369, and 376.

V. Neither could she, in that event, have any dower in his estate, no claim upon him for her support and. maintenance, either prior, or subsequent to a decree of validity, and no right to alimony, for none of these marital rights can arise out of a marriage, which is, in law, *no* marriage.

VI. The *evidence* certainly shows that defendant and Gavin were at least received and recognized by their respective families as man and wife, and her letters and declarations are in the nature of admissions to the same effect.

VII. From either of these facts a marriage may be inferred, and, surely, from all of them, it should be inferred. In answer to all this we have simply a general denial. The issue of illicit cohabitation is not even an' issue ; the inference is not sought to be avoided ; the facts. are simply denied. Then, if these facts were true, the legal inference must follow that they were, in fact, what they appeared to be — man and wife. In such case it follows, of necessity, that the subsequent marriage to the plaintiff was *no marriage,* and is absolutely void *ab initio.*

ELLISON, J.—In 1830, in the state of Vermont, there was born of an unmarried mother, a girl child, whose subsequent history forms the greater part of a voluminous. record of nearly four hundred pages. She was put in charge of her grandfather Hulett, under whose care and protection she grew into young womanhood. Her mother married a man named Remington, who was the child's reputed father. He died some years thereafter, and his widow, following the course of emigration then pouring from the east into Michigan, moved to Detroit, whither many of her relatives had preceded her. She had not been in Michigan long ere she married, perhaps in the

year 1843, a widower named John Haskins, he having several grown up girls by his former wife.

Defendant, in 1844, followed her mother to Detroit and took up her home with her, in her step-father's family. In the same city there had been married before this, a widower Marsh, to a widow Gavin, each having grown children. The Gavins consisted of several boys: James, Isaac, Knox and Charles, and it is Charles, who, next to the parties concerned, figures most prominently in this cause. It is on account of an alleged prior marriage between defendant and Charles Gavin that this suit is now prosecuted by plaintiff. He first instituted it for divorce only, the cause being intolerable indignities, and conspiracy to defraud him of his property. Thereafter, in December, 1882, he amended his petition and asked for a divorce for her unchastity, charging her with adultery in 1859, giving birth to an illegitimate child in 1878, and that at the time of her intermarriage with him she had a living husband in the person of Charles Gavin. Afterwards, the plaintiff filed yet another amended pleading, in which he omits all charges except the prior marriage to Gavin, and instead of asking for a divorce, he prays that his marriage with defendant be declared a nullity and void *ab initio*. Defendant made answer to the last amendment, in which she denied all but the marriage with plaintiff, and in addition thereto, she set up by way of cross-bill, many grievances against plaintiff, and prayed a divorce for his fault, with alimony. Her principal charges against him were gross indignities, habitual drunkenness, and adultery. On trial in the court below, the plaintiff prevailed, and defendant appealed to the supreme court of the state, from whence the cause was transferred to this court. The case presents some remarkable aspects. The evidence covers a period of fifty odd years, and comes mostly from people of advanced age, who are compelled to call back many facts and incidents necessarily forgotten in the vicissitudes of the length of a life-time since their happening. The defend-

ant, who had grown to be a woman of more than ordinary beauty and precocity, in a short time began an acquaintance with the Marsh family, especially the Gavin young men. She says she was on terms of particularly social friendship with Knox Gavin. Plaintiff charges that she became acquainted with Charles in July, 1845, and married him in September following. There is no record, or other written evidence of this marriage, nor is there any one produced who witnessed the ceremony. There are no children, dead or alive, as the fruit of this alliance. In September, 1845, Charles Gavin was convicted in a criminal court at Buffalo, New York, of petit larceny, and sentenced to imprisonment in the common jail for twenty days. In July, 1846, he stole fifteen dollars in money at Buffalo, and was convicted thereof in September following, and sentenced to three years in the penitentiary, ending in September, 1849. In 1850 he was regularly and publicly married in Detroit to Anna Bates, and shortly removed to Toledo, Ohio. His mother and stepfather visited him there, and he visited them at Detroit, burying, also, one or two of his children at Detroit, which were born of the Bates marriage. He does not figure personally in this record, from this period on, to about the beginning of the present action, when he turns up alive on the side of the plaintiff in this contest.

As I have said, defendant's reputed father was Remington, who afterwards married her mother. She was raised by her grandfather Hulett, and afterwards lived for a time with the Haskins family. She thus came to be known in Detroit by the name of Remington, Hulett, Haskins, and Gavin. How she got the latter name is one of the issues, as well as one of the mysteries, of this case. She was arrested August 2, 1847, on the complaint of Haskins, her stepfather, under the name of Paulina Gavin. She was married a year thereafter to Bernard Dunham, as Paulina Gavin. Shortly after this marriage, she and her husband removed to LaPorte, Indiana, where they lived only a short time. For some cause, or with-

out any cause, he abandoned her, and in 1850 she went to St. Louis, Missouri, in which city she met the plaintiff. She was still in the bloom of youth, and plaintiff soon became enamored with her. She told him of her past life, but as to what account she gave of it, is a controverted point between them. His statement of it is as follows:

"Defendant told me that before she came to St. Louis she lived in Detroit, Michigan, with her stepfather, John Haskins. That soon after going to Detroit, she met Charles R. Gavin, and got acquainted with him at Springwell, a place about six miles from Detroit. That some time after that she and Charles R. Gavin were in company at a party at night; that they, in company with a young lady, left the party and went in search of some one to perform the marriage ceremony between her and Gavin; the office of the justice of the peace had closed, and they went to a boarding-house, or hotel, where a preacher boarded, and that she and Charles R. Gavin were there united in marriage by that preacher; that they went to their stepfather's house that night and told her mother, Jane Haskins, that she and Gavin had just been married; that her mother did not approve of the marriage, and became enraged and threw a bucket of slop-water on her and Gavin, and drove him away and would not let him stay there that night; that next morning, her stepfather, John Haskins, went to the preacher who had performed the ceremony and threatened to have him prosecuted. That she and Gavin lived and cohabited together there in Detroit for some time thereafter. I don't remember how long, or whether she stated how long. That Gavin then started to California and died on the way, and that she then married Dunham."

Whatever may be the truth as to just what history she gave him of herself, he was in love with her and proffered assistance in divorce proceedings against Dunham, her recreant husband. The result was she obtained a divorce from Dunham, and was duly and formally mar-

ried to plaintiff on August 7, 1853, in the city of St. Louis. This is as far as the material portions of the evidence on this branch of the case agree; thence on to the end is a contradiction of both fact and circumstance as they are attempted to be established by either side.

While there is nothing witnessing the marriage, either written or oral, plaintiff relies for the support of the judgment in his favor on the proof of the marriage by reputation, defendant's acknowledgment to that effect, and the circumstances of her being arrested, and being married to Dunham under the name of Gavin. In other words, he does not rely on direct proof of the marriage itself, but only on such evidence from which, generally, a marriage will be presumed. Acknowledgment, cohabitation and reputation are presumptive evidence of marriage, and, standing alone, will be conclusive evidence of that question.

It is not contended by plaintiff that defendant met Charles Gavin earlier than July, 1845, or that their alleged marriage was earlier than September, 1845. He was sentenced to jail for twenty days, in the state of New York, for having, on the twenty-seventh of September, 1845, stolen a pair of pants in that state. He was again sentenced at Buffalo, in September, 1846, for having stolen money in July, 1846, for a term of years, expiring September, 1849. Defendant was publicly married to Bernard Dunham in August, 1848, in the city of Detroit. Thus, allowing that defendant married Gavin in September, 1845, he must have departed for New York immediately, and have entered upon his career of crime almost immediately, in order to have stolen the pants ere the first month of his marriage had expired. Allowing, also, that he returned to Detroit after his short term of imprisonment, his holding defendant out as his wife, and cohabiting with her as such, and the reputation of their marriage, must all have taken place between the time of his return to Detroit and the July following, for in that month he stole money in Buffalo, and was shortly there-

after sent to the penitentiary for three years, as before stated. It is as favorable to the plaintiff as can well be from indisputable facts, to say that the only opportunity defendant and Gavin had of holding one another out as husband and wife, and of cohabiting as such, and acquiring that reputation, was during the winter of 1845 and 1846. With that fact in view, I proceed to an examination of the evidence.

That of Isaac R. Gavin fails to sustain plaintiff's theory. It is true he says that his brother and defendant were married in 1845, but he states he learned this from the talk of his mother, who, he states, recognized her as a member of the family. His mother, Mrs. Marsh, denies this, and his stepfather states it is not true. In the matter of cohabitation and reputation, his evidence is point blank against plaintiff, for he says that his brother Charles lived at home with his mother all the time he was in Detroit, and he never knew of his living at any other place ; that he never knew of defendant living any place except at her mother's, and that he never heard any one say they were married other than his mother and Charles. Considering his relationship to the parties, his opportunity to know if his brother lived with the family while in Detroit, I am unable to understand how he could be mistaken as to his brother living at home with his mother's family all the time he was in Detroit, and that defendant did not live with them at any time. If this is true, there was no cohabitation—no dwelling together in the sense required in making out a marriage by presumptive evidence. The witness' mother and stepfather corroborated him in this regard. Cohabit means to dwell together ; to inhabit the same place, and when we say cohabit, we mean having the same abode, and when applied to the relation of husband and wife, it includes their sexual relation.

The sum and substance of Dezalia's evidence is that he was told by Charles Gavin that he, Charles, was defendant's husband. He did not pretend to know how

they were regarded, and was not positive as to his own opinion of their relationship. Van Tifflin saw them go in and out of a house perhaps a dozen times. He did not say they lived there, and the period of his observation or knowledge of them, he says, only covered about two months, from first to last. This is certainly a very limited acquaintance to be of much probative force in an important issue of this nature.

The other evidence presents many contradictions, and most of it comes from a source to cast much discredit on the statements made. De Mass and Burgess present good illustrations of the untrustworthiness of plaintiff's evidence under this head. They each state these parties lived together as man and wife for two years or more, when, by the admitted facts of Gavin's first acquaintance with defendant, and the record evidence of his imprisonment in Buffalo, together with defendant's conceded marriage to Dunham, makes their story an impossibility. They have Gavin and defendant living together as man and wife, under their observation, at specified places in Detroit to at least the fall of 1847, when Gavin had then been in the New York penitentiary for a year, sentenced for a crime committed in New York, of course, before his trial.

There is another consideration to be weighed in analyzing this evidence.

The majority of these witnesses give their depositions in the cause, and, though now far advanced in years, seem voluntarily to flaunt their own vice, immorality, and debauchery, in the face of the courts of justice. They say defendant lived in a house of ill-fame, and in speaking of this they leave the field of reputation and deal in facts derived from their own experience. They boldly state their frequent attendance upon this house. The vigor and indiscretion of youth may be argued as an extenuation of much immorality; but advancing years will silence all voluntary reference to such breaches of social and moral law with any one possessed

of the true principles of an honorable manhood. How can they, being evil, speak good things? "For out of the abundance of the heart the mouth speaketh," and witnesses who interlard their testimony with statements such as are found in this record, but photograph their own ideas of conscience, of right, and of truth. It is fit that courts should scrutinize such with great caution. It is just to refuse credit to them where important interests are at stake, and they stand contradicted by the testimony of reputable witnesses. This evidence discovers another important factor in arriving at a just conclusion of its force. The presumption of marriage is in favor of the innocence and good morals of the parties concerned. The law, looking upon men and women as moral members of society, will presume that when a man and woman are cohabiting, they are husband and wife, and will not presume they are man and mistress; this is based on the first presumption of morality and innocence. If parties, who may, by the evidence, be shorn of this charity of the law in the presumption of innocence and morality, are proved to have cohabited together, the presumption arising from such cohabitation is much weaker than it would be were the parties in good repute for the virtues which bind society together. The cohabiting of a rake and a bawd will afford much less presumption of a marriage than would the cohabiting of an honorable man with a virtuous and refined woman. The one couple often defy the sentiment of civilized mankind and the scorn of society, while the other renders perpetual obedience to an enlightened conscience.

The plaintiff is seeking to establish a marriage between Gavin and defendant by proof of their cohabiting together, and of their holding themselves out as man and wife; in other words, by presumptive proof. Now, let us look at the status of the parties, as plaintiff's proof fixes it. Plaintiff's statement says of Gavin: "Some time in July, 1845, she (defendant) met and formed the acquaintance of Charles R. Gavin, who was, at the time, twenty

years of age, and who was then entering upon a life of crime, and whose specialty consisted in the various devices of the confidence man, and in the uttering of counterfeit money." Record evidence further shows that in six weeks from this time he stole a pair of breeches in Buffalo, New York, and the following year was sentenced to the penitentiary for stealing money. A witness says he was looked upon as a "shrewd thief" in Detroit.

Plaintiff, by the evidence in his behalf, next fixes the status of defendant. Most of his witnesses say she was a prostitute immediately after, if not before, Gavin went to New York, which was in the spring of 1846. An analysis of plaintiff's evidence next fixes the status of the two together, in the relation, according to plaintiff's contention, of husband and wife.

Dazalia says she was living in a house of prostitution on Larned street, which place was known as a house of prostitution, and was kept by the same woman for years. On cross-examination, he says he never knew of her living at but two places, "old peppersass" (defendant's stepfather), and afterwards at Mrs. Lynch's. This Mrs. Lynch is the party referred to as the woman who kept the house for a number of years, as is abundantly shown by plaintiff's other witnesses. De Mass says they, Gavin and defendant, lived on Larned street, opposite St. Ann's church; that Mrs. Lynch lived down stairs, and they upstairs; that she lived there some time after he went to prison, and kept a house of prostitution. Burgess, also, says they lived on Larned street, opposite St. Ann's church.

McDonald says they lived at same place, and that the house was of bad repute; that an old woman with two children lived in the house and occupied it all summer; sometimes with one or two other girls. That on one occasion, before Gavin left, she complained to him (he was a constable) that she had had some articles of clothing stolen, and that defendant knew all about it; that he went up stairs, and saw defendant and Gavin in

bed together. It clearly appears, from this testimony, that Mrs. Lynch was keeping a house of prostitution or assignation; that she had been for years, and that it was known as such. Taking this evidence, as offered by plaintiff, we find that a thief and a prostitute are seen going in and out of a house of prostitution. The habitation is a house of ill-fame. It must follow, from a consideration of this branch of the evidence, that it only shows a meretricious connection between two bad people, carried on during the winter of 1844 and 1845. It will strike the most indifferent man that the presumption in favor of innocence, which is the foundation stone of presumptive evidence in this case, cannot obtain here where the parties are affirmatively shown not to be innocent.

There is another branch of the evidence, however, as presented by plaintiff, which goes much further, indeed, to sustain him than that just commented upon, and that is the uncontradicted record proof of her arrest by her stepfather under the name of Paulina Gavin, and her marriage to Dunham as Paulina Gavin. Her explanation of her taking the name of Gavin, it must be admitted, is, standing alone, far from satisfactory. She had been raised by her grandfather Hulett, and had gone by that name before she came into the Haskins family. If she wished to avoid the name of Haskins, as it was being given her, she being comparatively a stranger, and the Haskins family having been there for years, it would appear now she could have obtained that desirable end by proclaiming the name of Hulett. She says, however, her nearest friend, Knox Gavin, suggested the idea of passing as his cousin, Miss Gavin, as he did not like the repute of the Haskins girls, and that he introduced her by that name, and in that way she became known as Paulina Gavin. In this connection it must be remembered she was only fifteen years old, and must not be credited with much forethought. It is not going far to say a young girl of that age, raised as she had been, wanting to form a social acquaintance, might readily

adopt almost any suggestion made by a friend older than she, and who had been reared in the community. It is indisputably true that for some cause she did not like her stepfather or his family; that they quarreled, and it might very well be, that when old man Haskins had her arrested, knowing she was refusing to take his name, would complain against her by the name she had assumed. In this connection it must be borne in mind she was *nullius filius*, and was born without a name. And so the same line of thought will explain, to a degree at least, her marrying Dunham as Gavin.

Again, she wrote letters to Isaac and Charles Gavin, and it is urged with much force that they show her to have been married to Charles. The letters are not such as a good woman of any learning would write, yet, I cannot agree that they condemn her. The defendant, though a woman of physical charm and beauty, was not adorned with the acquirements of learning. Her expressions in the letters are most awkward. Her spelling is scarcely intelligible. They do not admit a marriage; they assert that if Charles will swear the truth, he will so state; they assert her innocence and her desperate strait to relieve herself of the false charge; they hold out inducements for testimony, when interpreted literally, that an honest person would not offer. But, as before stated, her apparent ignorance is such that it is necessary to look closely to her expressions. In one letter she says to Isaac that he could help her disprove the charges and she would pay him well for his trouble—that she might as well pay him as a detective. The letters, disconnected from the other evidence, would be of no force; would be harmless as proof of a marriage. The only remaining testimony on plaintiff's part consists in that relating to her acknowledgments to that effect made severally to plaintiff himself and to one Mrs. Barrett. Defendant denies each of their statements. In this connection, I will say that there exist admitted facts in this record, which not only tend to discredit the plaintiff's own evidence, but

leave their impress on all that offered by him.  He offered publicly a reward of one thousand dollars for evidence of defendant's marriage with Gavin.  He had in his employ, for the purposes of this case, some of the witnesses who had attempted to throw the balance in his favor by the weight of their testimony.  Old man Bell says he offered him directly one thousand dollars for his oath that he witnessed the marriage ceremony.  It is stated by disinterested witnesses residing in Vermont, that he made direct proposals to them to pay them money if they would swear that they had seen a man come out of defendant's room under circumstances indicating adultery. He testified his marital relations ceased with defendant in 18—, and that he purchased property in Vermont upon which she might reside apart from him.  It would, however, appear to be definitely settled by the testimony, that the property was purchased in Vermont for their joint residence, when he should have wound up his business in St. Louis, or else it was intended as a summer home for them.  He spent his summers at this place with defendant, occupying the same room and bed for many years after he states they had ceased to live together. He admits offering a reward for record evidence, and employing in his service some of the parties who appeared for him in the capacity of witnesses.  His conduct has a tendency to discredit his evidence.

Mrs. Barrett's evidence lacks all the elements of probability.  She was a dressmaker and a stranger to defendant, yet she relates that defendant voluntarily told her the story, which, if true, had been the secret of her life, which, if known, was her annihilation, and which she had kept securely locked within her own breast for the past quarter of a century.  Moreover, at this very time, she was using all her energies, all her resources and power to disprove the charge which had already been made by plaintiff.  It is scarcely conceivable that defendant, thus, at the very outset of a desperate legal conflict with her

husband, not only involving her reputation, but her property rights, would, without apparent reason or cause, voluntarily condemn herself. Singularly enough, this Mrs. Barrett, who resided in St. Louis, gives her deposition in East St. Louis, where she appears with plaintiff, without subpœna. Her excuse for crossing the river was that she had stopped at a notary's office in St. Louis, but found it too crowded. As it takes at least three days' notice to take a deposition, it must be the witness found defendant, or her attorney, in an accommodating humor to waive all formality and cross with her into another state. The long time she and plaintiff had resided in St. Louis should, I think, have enabled them to find some other office in that city where they might have avoided the crowd as well as in the quiet of the smaller city across the river. Her conduct on the stand, her conference with plaintiff in the midst of her cross-examination, do not look well. She stated she had a letter in her pocket from defendant corroborating her statements, but she stood out against all endeavor to have her produce it. No amount of persuasion would prevail upon her to even permit it to be copied. It was private. And while the veil of secrecy and of confidence could be removed from the verbal confession, the witness maintained inviolate all confidence reposed in her under the solemnity of a writing. Viewing this branch of the evidence in connection with all the other offered, we feel constrained to discredit it.

That defendant did go by the name of Gavin is conceded. That she took that name by lawful marriage is the point in dispute. I think the surroundings, the circumstances as shown by the evidence, the evidence itself, and the law as applied to these, are against the proposition. Husband and wife they are not proved to be. Man and mistress they may have been. Detroit, in 1845, was not a large place, and a public crime like bigamy would hardly be attempted in the midst of those knowing it to be a crime. The bigamist is an itinerant.

His conquests, for safety's sake, lie in different locali-ties. There is no proof of an actual marriage. No record or writing exists testifying to it. No one witnessed the ceremony. And just here there is a question of law raised by the defendant, to the effect that nothing short of direct proof of an actual marriage, such as the record, or the testimony of some one or more who witnessed the nuptials, will suffice, or is admissible in a criminal action or civil action of a criminal nature, which this is claimed to be. The view we take of another rule of law, as ap plied to the admitted facts, renders an opinion on this question unnecessary. Again, defendant is publicly and formally married in Detroit to Bernard Dunham in 1848, in the presence of her mother and aunt, less than three years after her alleged marriage to Gavin. It is hard to con-ceive that this could have taken place with impunity in a town of the size of Detroit, where all these witnesses to the cohabitation and reputed marriage with Gavin, lived. It will be remembered, too, that shortly after Gavin's release from the New York penitentiary he was formally married in Detroit to Anna Bates, a cousin of defend-ant's. So we have both marrying in the same town, among the same people who were said to have been cogni-zant of the first marriage. Is it possible that defend-ant's mother would have quietly witnessed her marriage to Dunham; or that the Gavin or Bates family would have permitted his marriage to Anna Bates, if it had been bigamy? But, added to all this, is the important fact that Gavin's mother and stepfather, Mr. and Mrs. Marsh, and some relatives of the Haskins family, all testify emphatically, they never knew of defendant be-ing married to Charles. Isaac Gavin, plaintiff's witness, says Charles lived with his mother and father all the time he was in Detroit, and it is against all reason, in the light of the surroundings of this case, to say they would not have known of the marriage if any had existed. It is true, Mrs. Marsh's testimony is contradicted by the evi-dence of some gentlemen whom plaintiff had employed as

his attorneys to investigate the Gavin marriage, but there is nothing assailing the old gentleman.

There is a point made against defendant, which, if we did not deem explained by the evidence, we would consider of great force, and that is that her mother, who is yet living and making her home with defendant, was not introduced at the trial, either in person or by deposition. Defendant, however, testified that her mother was an invalid and very old, and that two attempts had been made to take her deposition, but that her health and mind were such it could not be taken.

I have thus gone over the principal facts of this case as they can be gleaned from a voluminous record; and I will now proceed to state a few principles of law, which, when applied to the case, will fortify us on our conclusions as to the facts.

II. Again, recurring to the principle that the evidence offered by the plaintiff is not direct proof of the marriage itself, but only such as raises a presumption of marriage—presumptive evidence—it stands, unless overcome by contrary proof in the case, or a contrary and equally strong, or stronger presumption. "Nothing can be clearer than this, a presumption may be rebutted by a contrary and stronger presumption." *Jayne v. Price*, 5 Taunt. 326. In this case, granting plaintiff's evidence its full force, we have two presumptions, one of marriage to Gavin, and the other of the innocence of defendant of the crime of bigamy. And this latter presumption arises in her favor, notwithstanding she is not on trial for the crime. Which, therefore, is the stronger presumption in this case? Lawson, in his work on Presumptive Evidence, says: "Where there are conflicting presumptions, the presumption of innocence will prevail against the presumption of the continuance of life; the presumption of the continuance of things generally; the presumption of marriage (and) the presumption of chastity." This statement has ample backing from well considered adjudications. *Case v. Case*, 17 Cal. 598;

*Chamberlain v. Chamberlain*, 71 N. Y. 423 ; *Klein v. Landman*, 29 Mo. 259 ; *Jones v. Jones*, 45 Md. 144 ; *Squire v. The State*, 46 Ind. 459–64. In *Jones v. Jones supra*, the court say·. "The reason for such presumption is very clearly stated in the case of *Breaky v. Breaky* (2 N. C. 2 B. 349, 358), where the chief justice of that court, in delivering his opinion, said : 'If Andrew Breaky after cohabiting many years with this defendant, had, during her lifetime, married another woman in this country, he would by that act have destroyed the presumption of his marriage with the defendant, which would otherwise have arisen from the fact of cohabitation. He would have shown by it, what the law could not have presumed, that he was willing to incur the moral guilt of living with a woman as her husband, when he was not her husband, for, inevitably, this must have been the case in regard to one or the other of the women, when both were, to his knowledge, living at the same time. The consequence, then, would have been, that, if charged with bigamy in contracting the second marriage, the presumption would rather have been against the fact of the first marriage for cohabitation would in such case have supplied none in his favor; the inference would rather be, that he must have been aware there was no sufficient ground for the reputation of the first marriage, or he would not have incurred the guilt of felony, and the danger which attends it, "by marrying again."' "

In *Case v. Case, supra*, it is said, Field, C. J. (now of the United States Supreme Court), concurring, that, "in suit for divorce on the ground of adultery, the marriage will not be inferred from matrimonial cohabitation, with the reputation of being married persons, if the result of such inference be to prove defendant guilty of bigamy. In such cases actual marriage must be proven." And this "presumption in favor of innocence is not confined to proceedings instituted with a view of punishing the supposed offence, but holds in all civil suits where it comes collaterally in question." *Ib.*

In a case involving the settlement of a female pauper, Justice Pratt, in *Cayton v. Wardell* (4 Com. 280), said: "Cohabitation, attended with other facts, is merely a circumstance from which marriage is in fact presumed ; but where facts are proved from which a contrary presumption arises, the former evidence falls, or, at least, is neutralized, * * * The petitioner proved beyond cavil, a marriage in fact between her father and mother, and that she was the issue of said marriage * * * The circumstances proved would be sufficient, in the absence of conflicting circumstances, to raise the presumption of marriage with Schenck ; but when an actual marriage is proved with Meserve, this presumption is overthrown."

I regard the case of *Klein v. Landman, supra,* as an authority applicable under this evidence. In that case Klein and his wife sued Landman and wife for slandering plaintiff Margaret. The answer stated they had "no knowledge or information sufficient to enable them to form a belief whether plaintiffs are husband and wife as alleged." The defendant introduced, against plaintiff's objection, declarations made by Margaret, that previous to her marriage to her present husband, she had been married in Germany to another man. The court gave the following instruction for defendant : " If the jury find from the evidence that Margaret Klein was married in Germany to another person than Leonard Klein, the plaintiff, then such relation is presumed to continue and it devolved on plaintiffs to prove to the satisfaction of the jury that such marriage was legally terminated before the date of the marriage certificate read in evidence, or they cannot recover." This instruction, per Napton, J., was declared to be erroneous : "There was no presumption that a marriage, which was proved to have existed at one time in Germany, continued to exist here, after positive proof of a second marriage *de facto* here. The presumption of law is, that the conduct of the parties is in conformity to law, until

the contrary is shown. That a fact, continuous in its nature, will be presumed to continue after its existence is once shown, is a presumption which ought not to be allowed to overthrow another presumption of equal, if not greater force, in favor of innocence." The judge added that if it had been established that the first husband was still living, "we think she was still entitled to the benefit of the favorable presumption that the first marriage had been dissolved by a divorce, and that it was not incumbent upon her, in this character of action and under the pleadings in this case, to produce a record of the judicial or legislative proceedings by which the divorce was effected."

I can see no escape of plaintiff's case from the reasoning in that case. Here, Chas. Gavin is shown to be still alive, yet the supreme court maintain that so strong is the presumption of innocence as to the second marriage proven in fact, that the law will infer the first was dissolved. So, then, if we concede all plaintiff maintains as to the sufficiency of his proof to establish a marriage between defendant and Charles Gavin, yet an actual marriage with plaintiff being conceded, the presumption in favor of defendant's innocence will raise the inference that her marriage with Gavin was dissolved. The conclusion is inevitable, from the adjudicated cases cited and numbers not referred to, as well as standard text writers, that in order to invalidate a second marriage formally entered into and proven in actual fact, there must be actual, as distinguished from presumptive, proof of the first marriage.

Our conclusion is the court erred in finding for plaintiff, and we will reverse the judgemnt.

Defendant's cross-bill charges cruelty, indignities, habitual drunkenness, and adultery. Indignities are practically admitted by the plaintiff. Although upon the stand himself, in rebuttal, he does not deny his connection with Lizzie Taylor, and he admits he called defendant a whore and a prostitute, when drinking. The

affirmative proof on this head is abundant. He cursed and abused defendant in public ; called her vile names repeatedly. He reported her dead. He charged her with adultery. He conducted himself before the public as an unmarried man. ·He advertised through the public press, and at divers times verbally offered a reward for proof to sustain a charge against defendant tantamount to felony.

Under the law and the evidence, as we believe it to be, after a patient and painstaking investigation, we are constrained to hold defendant the injured party in this proceeding, and that she is entitled to a divorce from plaintiff for his fault. We, therefore, reverse the judgment and remand the cause, with directions to the circuit court to enter judgment of divorce in favor of defendant, for the fault of plaintiff, without restraint upon either party. The question of alimony does not seem to be sufficiently developed by the evidence as preserved, and we, therefore, also, direct the court below to proceed to determine the amount thereof, to which defendant may be entitled. The other judges concur.