| 97 | 606 |
|---|---|
| d100 | 262 |

# Richmond.

## Eldred & Others v. Eldred.

### November 16, 1899.

1. Marriage—*How Proved—Reputation, Declarations, and Conduct—Presumption.*—Marriage may be proved in civil cases, other than actions for seduction, by reputation, declarations, and the conduct of the parties. But, to raise the presumption of marriage, the reputation must be founded on general, not divided or singular, opinion; and, where the declarations of the parties are relied on, the circumstances under which they are made must determine their value.

2. Marriage—*Proof—Conduct of Parties—Presumption.*—In the interest of morality and decency the law presumes marriage between a man and woman when they live together ostensibly as man and wife, demeaning themselves towards each other as such, and are received into society and treated by their friends and relatives as having and being entitled to that *status.* But cohabitation and repute do not constitute marriage. They are only evidence tending to raise a presumption of marriage, and, like other presumptions of fact, may be overcome by countervailing evidence.

3. Marriage—*Declarations and Repute Contemporaneous With Conduct.*—The declarations of parties and other attendant circumstances of cohabitation, all which are admissible as parts of the *res gestae* to prove marriage, must, together with the repute originating therefrom, be contemperaneous with the intercourse, and not subsequent.

4. Marriage—*Matrimonial Cohabitation—Presumption.*—The presumption of marriage from cohabitation apparently matrimonial is very strong, especially where legitimacy is involved; and this presumption can only be overcome by cogent and satisfactory proof. But to raise this presumption the cohabitation must appear to be a matrimonial cohabitation. Mere cohabitation is not sufficient. It must be attended with such conduct as would justify the repute of the marriage.

Opinion.

5. MARRIAGE—*Particular Time and Place—Presumption as to Other Time and Place.*—If a party undertakes to establish a marriage between a man and woman at one time and place, he cannot rely upon other facts and circumstances to raise a presumption of marriage at some other time and place.

Appeal from a decree of the Circuit Court of Fauquier county, pronounced January 31, 1898, in a suit in chancery, wherein the appellee was the complainant, and the appellants and others were the defendants.

*Reversed.*

The opinion states the case.

*C. M. White* and *John A. C. Keith*, for the appellants.

*A. W. Armstrong* and *Eppa Hunton, Jr.*, for the appellee.

CARDWELL, J., delivered the opinion of the court.

E. A. Eldred, an infant, by his next friend, instituted a suit in the Circuit Court of Fauquier county, in which he alleged that E. B. Eldred died seised and possessed of an undivided moiety of certain real estate in the county of Fauquier, the other moiety thereof being owned by John A. Eldred; that E. B. Eldred died intestate, leaving surviving him a widow, Zellah K. Eldred, and the complainant, his only child and heir at law; that the brothers and sisters of E. B. Eldred denied that complainant and the said widow were entitled to any share of the estate of E. B. Eldred, and the prayer of the bill is that Zellah K. Eldred, and the parties who would have been the heirs at law of E. B. Eldred but for the existence of the widow and complainant, be made parties defendant thereto; that the rights of the widow and complainant be determined, and that the real estate owned jointly by E. B. Eldred and John A. Eldred be partitioned between John A. Eldred and the complainant.

To this bill all of the defendants filed an answer, except Zellah

K. Eldred (so called), in which, while not denying that the complainant is the natural son of E. B. Eldred, they deny that he left any child, the offspring ·of a lawful marriage. Depositions were taken, and exhibits filed, and upon the hearing of the cause, the judge of the Circuit Court decreed that Zellah K. Eldred is the widow, and the complainant the lawful and sole heir of E. B. Eldred, deceased. From this decree an appeal was obtained to this court.

The only question, therefore, is whether E. B. Eldred and Zellah L. Keiner, called in this record Zellah K. Eldred, the mother of complainant, were ever married.

It appears that in 1895, there were residing in Fauquier county a family consisting of A. P. Wetmore, his wife Sarah K., and three daughters, named respectively, Zellah L., Lizzie, and Mary Keiner, children of Mrs. Wetmore by a former marriage. The family came from Pennsylvania in 1890. In June, 1895, E. B. Eldred, about 77 years of age, and an old friend or acquaintance of A. P. Wetmore in Pennsylvania, came to Fauquier county looking for a farm. He made his temporary sojourn with the Wetmores, and on the 28th day of June, 1895, he made a visit to Washington city, taking with him the girls Zellah and Lizzie, returning with them the next day to the Wetmore home. He succeeded in finding a farm to suit him in Fauquier county, known as " Spring Farm." It was conveyed to him on the 18th of July, 1895, but, having repairs to make, he did not take actual possession of it until about the 1st of August, 1895. In the meanwhile, he (as an unmarried man) conveyed to his brother John A. Eldred, an undivided half interest in this farm, and, during the repairs to the property, he and · his brother John boarded with a neighbor,· J. H. Edwards. On taking possession of the farm, Zellah Keiner, one of the three daughters of Mrs. Wetmore, went with him in the capacity of housekeeper, or, as Mrs. Wetmore expressed it, "to take charge of his house, and look after things for him." A child (the complainant) was born to

Zellah on the 10th of September, 1896, and E. B. Eldred died in January following.

There is not an intimation of any marriage of E. B. Eldred with Zellah Keiner, or any rumor concerning it, that does not connect it with the visit to Washington on the 28th of June, 1895. No one suggests any marriage in Virginia, and Mrs. Wetmore says that Zellah was never out of Virginia from the time E. B. Eldred came to Virginia until his death, except on the occasion when she and her sister went with him to Washington.

No witness is produced who professes to have any knowledge of a marriage between these parties. No certificate of marriage is produced, and therefore the declarations of E. B. Eldred and the conduct of the parties are alone relied on to raise the presumption of their marriage.

Marriage may, doubtless, be proved, in civil cases, other than actions for seduction, by reputation, declarations, and conduct of the parties; but, where reputation is relied on, that reputation, to raise the presumption of marriage, must be founded on general, not divided or singular, opinion; and where reputation in such case is divided it amounts to no evidence at all. And so with respect to the declarations of the parties. The value of such declarations as evidence will always depend upon the circumstances under which they were made. This is the rule as laid down by Lord Eldon and Lord Redesdale in *Cunningham* v. *Cunningham*, 2 Dow. 482.

If parties live together ostensibly as man and wife, demeaning themselves towards each other as such, and especially if they are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married. *Barnum* v. *Barnum*, 42 Md. 296; *Redgrave* v. *Redgrave*, 38 Md. 97; *Cunningham* v. *Cunningham, supra;* and *Womack* v. *Tankersley*, 78 Va. 242. But cohabitation and repute do not constitute marriage. They are only evidence tending

to raise a presumption of marriage, and, like any other presump-tion of fact, may be overcome by countervailing evidence. *White* v. *White,* 7 L. R. Ann. 801 (82 Cal. 427); *Cartwright* v. *McGowan,* 121 Ill. 388; *Waddingham* v. *Waddingham,* 21 Mo. App. 609; *Barnum* v. *Barnum, supra;* and *Com.* v. *Stump,* 53 Pa. St. 132.

The declarations of parties, and other attendant circumstances of cohabitation, all of which are admissible, as part of the *res gestae,* to show a virtuous intercourse between man and woman, must, together with the repute originating in consequence, be contemporaneous with that intercourse and not subsequent. With respect to the declarations of parties themselves, their value depends chiefly upon the circumstances under which they were made; and reputation, favorable or unfavorable, is founded on general, and not singular, opinions—being the social verdict upon the pair, as one may say, and a verdict society rarely fails to give from its means of knowledge. Where reputation is found divided, or the cohabitation is partial or irregular, the virtue of the cohabitation is discredited at once, and the presumption of marriage fails unless strengthened by other means. Schouler on H. & W., p. 63, and authorities cited.

In all such cases the rule of evidence is the same in civil as in criminal proceedings, and the decision must be on the weight of the evidence. *Womack* v. *Tankersley, supra.*

As we have already observed, appellee relies upon the declara-tions of E. B. Eldred that he and the mother of appellee had been married, and the evidence of these declarations connects them with the trip to Washington June 28, 1895, and no witness testi-fies to any declarations of E. B. Eldred that Zellah Keiner was his wife made prior to May, 1896, when her pregnancy had be-come known. We have, therefore, only to determine whether or not any marriage took place on the Washington trip, as there is not the slightest evidence of any declaration of E. B. Eldred of any sort of a marriage at any other time or place.

Opinion.

The law in the District of Columbia is positive in its require-
ments of a license to marry. After providing for the granting
of license, sec. 6 of the statute, provides that " no person within
this District shall marry without such license," &c., &c., or before
the names of the parties intending to marry shall be thrice pub-
lished in some parish, church, or chapel, meeting-house, Romish
chapel, or other house of religious worship, in the county where
the woman shall have her usual residence, on three several Sun-
days by some minister residing in the same county where the
woman to be married usually lives, under the penalty of £500,
current money, and a like penalty is imposed on any minister
marrying parties without such license and publication as the act
requires.

That no license was issued for the marriage of these parties
in Washington city is proved by the clerk of the court having
official charge of such matters, and the publication required by
the statute in lieu of license was impossible. Lizzie Keiner, one
of the party who went on the trip to Washington, has not been
called to testify, although it would seem, that a marriage on that
trip could not have taken place without her knowledge, and her
silence is unexplained, notwithstanding her sister's character is
involved in this controversy.

The other sister, Mary, testifies that on the return from Wash-
ington, the parties occupied separate rooms, and nothing was
heard of a marriage; that she visited her sister at " Spring Farm "
in the summer of 1895, the winter of 1895-'6, and stayed with
her most of the summer of 1896, and also visited her frequently
at other times, yet she admits that she never heard of this mar-
riage till told of it by E. B. Eldred in May, 1896, ten months
after the Washington trip. Although she had frequently visited
her sister at " Spring Farm," staying at the house a great deal
during the year 1895 and the early part of 1896, the witness
does not testify that E. B. Eldred and Zellah Keiner occupied
the same room, or conducted themselves towards each other there

as husband and wife until the summer of 1896. When asked: "Will you state where, when, by whom, and under what circumstances they were married?" she answered: "Mr. Eldred told me they were married in Washington." Neither this witness nor any other witness says that Zellah Keiner ever claimed to have been married to E. B. Eldred. When asked: "Did your sister ever tell you by whom and where, as to exact place, she was married?" she answered: "I never asked her." It would seem remarkable, to say the least, that the witness never inquired of her sister anything concerning her marriage, although she claims that her sister and E. B. Eldred occupied the same room in the summer of 1896, and had not prior to that time done so, so far as the witness knew. She simply contents herself by saying, "Mr. Eldred told me they were married, and that was enough." While the witness says she heard E. B. Eldred call her sister Zellah his wife, she is immediately asked to state anything she could recall that she heard him say on the subject, and she fixes the time at the house of the Wetmores on Thanksgiving day (in November), 1896, when he called Zellah his wife, and so introduced her, and told persons there about his son, &c. When asked if the neighbors visited her sister at "Spring Farm," and if so, to name some of them, the witness answered, "Yes," and gave the names of certain ladies, but, while ten witnesses are examined other than this witness and the mother of Zellah, not one of the ladies named in the list given by the witness was called to testify.

The witness further testifies that she saw a certificate signed by one George Smith, showing the marriage of her sister Zellah to E. B. Eldred in Washington on the 29th day of June, 1895, but, unhappily, this certificate does not appear in this record, and the proof is conclusive that if she saw such a paper, it was a spurious document, and known to her to be such. As to this so-called certificate, we shall have more to say later on.

Mrs. Wetmore, mother of Zellah, upon whose evidence much

reliance is placed, when first examined, was asked: " Have you any evidence within your possession or knowledge as to where and when or how celebrated?" (referring, of course, to the alleged marriage of Zellah to E. B. Eldred), she answered: " Nothing definite." One month afterwards she was again examined, and when asked, if since her former deposition she had acquired any additional information about this marriage, she replied: " I do not know any more about it now than I did then. All I know is just what Mr. Eldred told me." She admits that Zellah never told her that she was married, but says that Zellah received letters addressed to " Mrs. E. B. Eldred," and files two, and says, " Of course there are plenty more at home," but though her second examination was over a month afterwards, no other letters were produced, and the two produced were written after the birth of the child and by witness' daughter Mary. Let us, however, examine more at length the deposition of Mrs. Wetmore. After stating that her husband and E. B. Eldred were old friends in Pennsylvania; that they were raised together; when Eldred came to Virginia to live, &c., Mrs. Wetmore was asked the following questions and gave the following answers:

" State the circumstances under which your daughter, Miss Zellah, went to live at E. B. Eldred's?" Answer: " Mr. Eldred's health was very poor in Pennsylvania, and he came down to Virginia and spent six or eight weeks with us in the fall and winter of 1894, and his health improved so much that he concluded to come and make this his home—should have stayed right with us if it had not been for this brother he had, this John Eldred. Mr. Eldred concluded that he would buy a place here, and make a home for him, as he had John to take care of. He looked around at several places, and found no other place to suit him so well as ' Spring Farm.' He bought that place and gave John an undivided half of it. I mean John Eldred, so as to provide a home for him. He bought the place in July, 1895, and he was back and forth at our house until he got settled down

there, and then about the 1st of August they went to live there; my daughter went to live and take charge of his house, and look after things for him. We visited them frequently, my husband and myself. We used to stay several days at a time. Mr. Eldred always spoke of our farm as up home, and Mr. Wetmore always spoke of Mr. Eldred's as down to the other place. We were about like one family. If we had anything Mr. Eldred did not have he would send to us for it, and if he had anything down there that we did not have we sent after it."

"Did your daughter go as housekeeper for Mr. Eldred, for compensation, or for the friendship that existed ,between Mr. Eldred and Mr. Wetmore?" Answer: "Just for friendship. I did not want her to go, but I was afraid of hurting Mr. Wetmore's feelings if I did not let her go." "How long did she remain there in the capacity of housekeeper?" Answer: "Several months; I am not positive just how long. Of course, she was housekeeper all the time she was there."

"Please state what change of relations between your daughter and Mr. Eldred then took place, and all the circumstances connected with it?" Answer: "The fact is I never discovered any change. He was always one of the kindest men that ever lived. The only change was his announcing to me that they were married. The latter part of April, or the first part of May, 1896, after Mr. Wetmore's death, I went down after my daughter. I felt as though I would have some one to lean on, and I had always leant on her. I told Mr. Eldred I came down to get Zellah, as I had to have her to help me. Mr. Eldred said, ' Mrs. Wetmore, you can't take Zellah.' I said she is my child; I think I have the best right to her. ' Well,' he says, ' but, Mrs. Wetmore, she is my wife.' He says you certainly can't take my wife away from me. I considered that authority enough. I went home and knew that it was so, as his word was never disputed, and I had nothing more to say."

"You did leave her there, then, in pursuance of his claim of

her as his wife?" Answer: "Yes, sir; I had no right to take her away." "Was this the first announcement of his marriage of which you were aware?" Answer: "No, sir; they both went to Washington, Mr. Eldred and my daughter, on the 28th of June, 1895, and after they got back it was circulated all through the country that they were married. I paid no attention to it, just looked upon it as a rumor."

The witness then tells of how Zellah was treated in the house of E. B. Eldred by John Eldred and by the servants, saying that she was treated with the utmost kindness; that ·E. B. Eldred never left the house or returned to it without kissing Zellah; that several people called her Miss Zellah just as they had done before, and others who had not called her such called her Mrs. Eldred; that when Mr. Eldred introduced her at all, it was as his wife, and that letters came through the mail, some addressed to " Mrs. E. B. Eldred " and others to " Mrs. Zellah K. Eldred." She then files the two letters above spoken of, and speaks of and files a letter addressed to Mrs. E. B. Eldred from a Dr. Preston, of Warren, Pa., but this letter, not sent through the mails, was dated February 26, 1897, after the death of Mr. Eldred, and was doubtless written in response to a communication from Zellah or some friend or acquaintance of hers, asking that a case of Dr. Preston's medicine be sent her. Witness is then shown a letter addressed to E. B. Eldred, dated October 14, 1895, at Warren, Pa., in which the writer, a cousin of Mr. Eldred, speaks of his being married, &c., and witness says Mr. Eldred showed her this letter in his life-time, but does not say when, nor could it have been prior to May, 1896, as witness had already said she did not know of any marriage till then. If the writer of this letter had any knowledge of a marriage of her cousin, E. B. Eldred, prior to that time, she seems to have been the only person who did. Question: " In your previous examination you have spoken of your going to Mr. Eldred's to take your daughter home, and he declined to permit you to do it,

because he had been married to her; did he on that occasion offer to produce any evidence of his marriage, and, if so, what occurred in connection with it?" Answer: "Yes, sir; he went to his bureau drawer and took out a paper. He says, ' Here is your evidence, madam.' I did not examine the paper. Know nothing about its contents, or what it was."

" Why did you not examine it?" Answer: " I considered his word proof positive."

On further cross-examination, referring to the rumors she said she heard of when Mr. Eldred and Zellah returned from Washington June 29, 1895, Mrs. Wetmore was asked: " Hearing these rumors, why did you not investigate them before you allowed your daughter to live with Mr. Eldred in the capacity of a housekeeper?" Answer: " I never investigate rumors."

" Did your daughter afterwards accompany Mr. Eldred without the limits of Virginia?" Answer: " No, sir; they went to the Springs and to Fredericksburg, but not out of the State of Virginia." Question: " Do I understand you to say that while your daughter was living with Mr. Eldred as housekeeper for a long period of time, you being informed that they had been living as man and wife, took no pains to ascertain whether or not that was their true relation?" Answer: " I had Mr. Eldred's word for it, and that was all the evidence that I wanted."

Witness having spoken of Mr. Eldred taking Zellah about with him visiting, and upon business trips, was further cross-examined as follows: " Will you state whether or not your other single daughter was not for long periods of time a visitor at Mr. Eldred's, and whether he did not on such trips take your other daughter also with him on said trips and treat them alike?" Answer: " No, sir. He treated one as his wife, and the other as his sister." Question: " Were you with them on these trips?" " Yes, sir, occasionally; we were with them in Fredericksburg, and at their home a great many times." " Please state the occasions on which you accompanied them to Fredericksburg." An-

swer: " Well, once we went to the Fair together. I guess that
is the only time we ever went to Fredericksburg, but we stayed
down a couple days. I also went with them to Bealeton." " When
you went to the Fair in Fredericksburg, did your other daughter
go with Zellah? " Answer: " No, sir; Mr. Eldred went with
Zellah; myself and husband were with them." Question: " When
was that? " Answer: " In October, 1895." Question: " You
have said that you were there two days; did your daughter and
Mr. Eldred occupy the same room? " Answer: " I can't tell you;
we went to our room, but what they did I can't tell you? " Ques-
tion: " Will you explain why it was that if he treated your
daughter Zellah on that visit (to Fredericksburg, October, 1895,)
as his wife, how it was that in May, 1896, when you went to take
her home, after your husband's death, you were surprised at his
telling you about their marriage? " Answer: " I did not say on
their visit to Fredericksburg how Mr. Eldred treated my daugh-
ters, because my daughters were not with us. It was myself,
husband, Mr. Eldred and his wife was all there was. Outside of
that I said he always treated her as his wife, and the others
as his sisters. No; I cannot explain other people's actions."
Question: " You can tell why it was you were surprised, though,
can't you? " Answer: " Because I was not aware of the fact
before. And when I asked him why he did not tell me, he said,
' Owing to my business—my financial matters. I wanted to get
my money all in Virginia.' He said, ' There are a few things
in this world we can please ourselves about. I am old enough
to know my own business. I do not need a guardian, and do
not need to ask anybody's consent to what I do.' " Question:
" You have stated that you, your husband, Mr. Eldred and your
daughter, Zellah, spent two days in Fredericksburg in October,
1895; did Mr. Eldred then treat her as his wife, or otherwise? "
Answer: " He treated my daughter just as my husband treated
me. We went to the hotel and got our dinners, drove up to the
fair grounds in separate rigs. When they got ready they came

back, and when we got ready we came back.    Mr. Wetmore had
some teeth extracted, and we went to Jimmy Lane Greene's
residence, and did not see them any more while they were in
town.    After we got back to the hotel we went to our room, and
what they did we do not know."    Question: " From what oc-
curred on that occasion, was the belief upon your mind that they
were man and wife? "    Answer: " I never gave it a thought one
way or the other.    They were both of age.    They could do as
they pleased themselves."

When pressed to say whether on that occasion she had any idea
that Mr. Eldred was her daughter's husband, the witness con-
tents herself with the answer: " I must truthfully say I never
gave it a thought."

This is a most extraordinary statement to be made by a mother
who had shown by her testimony that notwithstanding her many
visits to the house of E. B. Eldred, remaining several days at a
time, she saw nothing in the conduct of Mr. Eldred and her
daughter, Zellah, to lead the witness to believe that they were
married; that they did not occupy the same bed chamber, and
that witness really had no thought that they were married till
told so by Mr. Eldred in May, 1896, when the condition of
Zellah was apparent to all.

Let us follow this witness, however, a little further.    When
asked if she was not present in the office of a certain lawyer in
Warrenton, in the early part of 1897, and after Mr. Eldred's
death, in company with John A. Eldred, Samuel D. Eldred
and others, including her daughters Zellah and Mary, and if it
was not then stated publicly, and with her approval, that her
daughter Zellah had a certificate of marriage between her and
E. B. Eldred, said to have taken place in Washington city,
the witness answers: " John A. Eldred told me he had the cer-
tificate or a certificate.    Had it with him, so he said."    " Do you
know of any effort being made by anybody to manufacture a
certificate of marriage? "    Answer: " I was never implicated

in anything of the kind. No, sir, not positively." Question: " Have you any knowledge of any effort being made by anybody in which you were not implicated to manufacture a certificate of marriage ? " Answer: " No, sir." Question: " If John A. Eldred said he had a certificate of marriage, did you ever ask to see it, or was it shown to any one? " Answer: " Yes, sir; I asked·to see it, and saw it." Question: " Who was it signed by, who was the clergyman, and where did it purport to have taken place? " Answer: " I do not remember by whom it was signed, · or who was the clergyman, but it purported to have taken place in Washington." Question: " Did it have the seal of the court attached to it? " Answer: " I can't say." The witness' daughter Mary says· that this certificate had before been brought to the Wetmore house by John A. Eldred and shown to all of them there.

It is sufficient to say, with reference to this so-called marriage certificate, that the record discloses that, after the death of E. B. Eldred, a paper purporting to be a marriage certificate was gotten up by John A. Eldred, with the knowledge of Mrs. Wetmore and her daughter, Zellah, to be used in furtherance of some compromise between these parties as to their rights in the property left by E. B. Eldred, but the arrangement was never carried out, and this doubtless explains the fact that the paper never came to light in this litigation. That it was a spurious document there is no sort of doubt, and the effort to get up such a document stamps John A. Eldred, Mrs. Wetmore, and her daughter Mary as witnesses whose testimony must be cautiously weighed.

The testimony of Mrs. Wetmore and her daughter Mary utterly fails to show that a marriage between E. B. Eldred and Zellah Keiner took place in the city of Washington in June, 1895, as they would have us believe.

We come, then, to a consideration of the evidence as to how these parties were regarded by their neighbors, and as to whether

or not there was such cohabitation and repute of marriage between them as would warrant the presumption that they were married.

Besides, Mrs. Wetmore and her daughter Mary, appellee called as witnesses to prove the marriage ten others. First, Maggie Blackwell, a colored cook for Mr. Eldred from June 1 to December 25, 1896, and she confessedly knew nothing about the parties occupying the same room, though she does say that Mr. Eldred treated Zellah as his wife; that people on the place called Zellah Mrs. Eldred; that she was so called in Mr. Eldred's presence; that the people who came to the house called her Mrs. Eldred; that Mr. Eldred called her Mrs. Eldred, and spoke of her as his wife. It will be noted, however, that this witness did not enter the employment of Mr. Eldred till June, 1896, and is flatly contradicted by other employees about the place.

Dr. Cooper, who only visited at Mr. Eldred's professionally, was first called in to attend Zellah when her child was born, and attended Mr. Eldred in his last sickness. He said that he had known Zellah for three or four years, and knew Mr. Eldred; that he frequently met them together at Mrs. Wetmore's; that E. B. Eldred, in speaking of the mother of the infant child, called her his wife; that she was called Mrs. Eldred by visitors and servants at the house of E. B. Eldred; that during his visits to " Spring Farm " she was recognized and known as the wife of E. B. Eldred; that E. B. Eldred paid him for attending Mrs. Eldred; and that Mrs. Eldred paid him for his attendance upon Mr. Eldred; that Mrs. Eldred was performing such duties as a wife usually performs in attending a sick husband; that E. B. Eldred manifested feelings of affection for Mrs. Eldred; that he acknowledged the child as his and seemed delighted when he was born, particularly so when told that the child was like him, and that, when going to attend Mrs. Eldred, the neighbors on the road asked witness how Mrs. Eldred was. The witness, however, is silent as to how these people conducted themselves

towards each other prior to the time he was called in at the birth of the child, as he knew nothing of their manner of living. He says there were some reports about a marriage in Washington prior to the birth of the child, but he did not know when nor how the report originated. He lives seven miles from the Eldred house, and six miles from the. Wetmore's. Saw more of the Wetmore family than of the Eldred's, but could not say when he heard the report of a marriage between E. B. Eldred and Zellah, nor could he say when he first heard her called Mrs. Eldred.

Mrs. Cooper says no more than that she met Mr. Eldred with the mother of appellee after the latter's birth, and he told her that he was taking his wife up to see her mother. Witness knew nothing of any marriage of these parties.

R. M. Teat sold E. B. Eldred some fertilizer in the spring of 1896. When he came to settle (he does not give the date), Zellah was present, and, having something to say about the settlement, witness asked what she had to do with it, and was told by Eldred that Zellah was his wife; yet witness, residing five miles from the Wetmore's, had never before heard any report of the marriage, or seen any notice of it. Heard it afterwards, but could give the names of only two persons who told him that they had heard it.

I. H. Zerr says that he was at E. B. Eldred's in 1896, took a walk with Zellah, her sister, and Hugh Edwards to the river, returning about eight o'clock in the evening, and saw nothing to suggest to his mind that Zellah was not a single lady. About September or October, 1896, he was there again to deliver some beef his father had sold Eldred. On this occasion Mr. Eldred invited witness in to see his boy, and he said he would call to see witness' father as soon as his wife was able to travel. Not until that occasion had any impression been made upon this witness' mind that Zellah was E. B. Eldred's wife, and, although witness resided only about four miles from "Spring Farm," he

had heard no rumor current in the neighborhood of the marriage of E. B. Eldred and Zellah.

Daniel Shumate seems to have been familiar with the family. He says he frequently visited Mr. Eldred and generally took Mrs. Eldred's sister with him, if she was not already there; that Mr. Eldred did and acted about the house as a married man, but never told witness he was married, because he had no occasion, as he knew witness had been told he was married; that when witness first began to visit them, Mrs. Eldred was not treated by Mr. Eldred as his wife, but there was a change a month or so after he moved down to " Spring Farm." Just what time he does not say, and, although he says their neighbors visited them, he does not state which of their neighbors. On cross-examination, when asked when he heard a current rumor in the neighborhood that the marriage had taken place, he answers: " I have heard several people talk about and ask about it, but never heard anybody state positively that it was so. I think this was some time in June, 1896." Of course, the witness could not have seen anything or heard any statement leading him to believe that the parties were married sooner than May or June, 1896, for the mother and sister of Zellah, who had better opportunities to learn this if it were a fact, than the witness, disclaim any knowledge of it prior to May, 1896. The mother was surprised to hear of it then.

Dr. Cooke lived one and a quarter miles from the Eldred's. For some time he thought Mrs. Eldred was simply the house-keeper, until he heard they went on to Washington and were married, and after that Eldred introduced her to witness as Mrs. Eldred, saying that persons were busying themselves talking about himself and wife, but that he had reasons for keeping his marriage a secret, and to the best of witness' recollection, Mr. Eldred brought the baby in for him to see it. . Witness was unable to say how long Zellah had been living at " Spring Farm " as housekeeper, as he supposed, and it is manifest from

his testimony that, so far from there being a current rumor in the neighborhood that these parties were living together as man and wife, it had come to the ears of E. B. Eldred that his neighbors were talking of their living improperly together; and it is also evident that it was after the child was born, or certainly not long before, that Zellah was introduced to witness as Mrs. Eldred, and he first heard of the marriage in Washington.

Rev. Mr. Shupoff testifies that he visited E. B. Eldred in his last illness, in January, 1897; that E. B. Eldred introduced him to Zellah as his wife; that he talked to Mr. and Mrs. Eldred in regard to his infant son, of whom he seemed very fond; that witness had his little daughter with him, and Mr. Eldred wished him to bring his wife and daughter to his house, that they might get better acquainted, and that Mr. Eldred thought by spring his son would be able to walk. Although witness lived three and one-half miles from " Spring Farm," he says he had never seen any public notice or heard any current rumor of a marriage, and had never before visited the Eldreds.

George W. Zerr testifies that he knew Mr. and Mrs. Eldred, and went to their home; that Mr. Eldred told him he would come to see him as soon as his wife was well; that when he went there he called her Mrs. Eldred, and that during his last visits Mrs. Eldred was performing the duties and acting in a manner the wife generally does. Witness, however, says that he only knew Mr. Eldred about five months before his death, and speaks more particularly of two visits within ten days prior to his death.

The remaining witness for appellee, H. W. Teats, only says that in the spring of 1896 E. B. Eldred told him he was a married man, and that Zellah was his wife, and that after that he called her Mrs. Eldred, and that witness afterwards visited Mr. and Mrs. Eldred at their home, and that Mr. Eldred treated Zellah as his wife.

For the defendants the evidence is as follows: S. D. Eldred, a nephew of E. B. Eldred, identifies two notes filed, written to a

Mrs. Corben in the neighborhood as late as May 16, 1896, and signed by " Zellah L. Keiner," and no letter from her has been shown signed otherwise, either before or after the birth of her child.

C. H. Thompson, postmaster at the office where the Eldreds received their mail, some three miles distant, says no letters came to Zellah addressed as Mrs. Eldred until after her child was born, and ,even then some continued to come as before; that not until the child was born was it ever reported that E. B. Eldred and Zellah were married, and that the general reputation in the neighborhood was that they never were lawfully married.

John T. Brown lived about half a mile away. Had been in business there for six.years. Part of the time boarded with Mrs. Edwards. Visited the Eldreds. Knew of nó marriage. Supposed Zellah was housekeeper. Witness' family did not visit there for reason that he did not like to state.

Wallace Edwards lived with E. B. Eldred from September, 1895, to November, 1896. He says Eldred never told him he was married; that Zellah did not occupy the same bed with Eldred; that witness had opportunities to know this fact; that she was housekeeper; that Zellah told witness she was never going to get married as long as E. B. Eldred lived, but in June or July, 1896, John A. Eldred told witness E. B. Eldred and Zellah were married, though he did not know that it was a fact.

Samuel Freeman did a good deal of work for Eldred. Once, while whitewashing, Zellah came out and wanted to know who said she was a hired hand. She said she was not hired, was just taking care of Mr. Eldred, and never intended to marry or leave Mr. Eldred as long as he lived, and witness always called her Miss Zellah Keiner.

I. H. Edwards lived about one mile from " Spring Farm." E. B. Eldred boarded with him before he got possession of the farm for about one month, and witness worked for him about two months. He knew nothing of any marriage, and never heard Zellah called Mrs. Eldred.

H. R. Eldred, a brother, who lived in Washington, says he visited E. B. Eldred in Virginia in 1895, staying from two to four weeks. Again in January or February, 1896, also last of July, 1896. Supposed Zellah was housekeeper. Was never informed that she was married; that the servants or employees never addressed her as his brother's wife. Saw that she was pregnant, and had been told by E. B. Eldred in Fredericksburg in July, 1896, that his housekeeper was in that condition.

John A. Eldred, who seems to have been a favorite brother of E. B. Eldred, lived with the latter, and testifies that his brother was never married to Zellah; that she was regarded as housekeeper only, by the servants and employees on the place, &c., and not called Mrs. Eldred. He says that when he saw the condition of Zellah he told his brother, in 1896, that he would have to say he was married to her, or they would be burned out; that the people were very indignant about it, and that his brother agreed that it was best to claim that there had been a marriage, and agreed that witness should so state to employees on the place. This witness, however, shows up in such bad light in connection with the forged certificate of marriage to which we have before referred, and in other respects, that we attach little or no importance to what he says, although what he did with reference to the forged certificate was participated in or approved of by Zellah, her mother and sister, and the whole of Mrs. Wetmore's family knew that it was to be brought to Warrenton to be delivered to the lawyer then representing Zellah, if called for.

The presumption of marriage from cohabitation apparently matrimonial is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, marriage, and not concubinage, legitimacy and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. *Hynes* v. *McDermott*, 91 N. Y. 451. But in every case the presumption

of virtue and lawful marriage may be rebutted, and cohabitation alone is not sufficient proof of marriage, nor sufficient to raise the presumption of a marriage. There must appear a matrimonial cohabitation, and this justified by contemporaneous behavior of the parties, such as should furnish society the reputation of marriage. Schouler on H. & W., p. 63.

There is no room for doubt that cohabitation between E. B. Eldred and Zellah Keiner began months prior to May, 1896, but it is not shown to have been a matrimonial cohabitation, nor that their behavior was such as should have furnished to society the reputation of marriage. On the contrary, their conduct was such as to furnish no foundation for the presumption that they were married, and, even after May, 1896, instead of an uniform and undivided opinion among their neighbors that they were married, the proof shows the reverse, and wholly overthrows the contention that a marriage between them took place in the city of Washington, as stated by E. B. Eldred, or the presumption that it took place anywhere else. If these parties were married, what excuse was there for keeping it a profound secret, till their conduct had given rise to a scandal in the community? None whatever is given and none attempted, notwithstanding the intimacy between the two families as testified to by Mrs. Wetmore, except a statement by her and one other of the witnesses that E. B. Eldred said he had a reason for keeping his marriage a secret. We look in vain for even a plausible reason. It is suggested that it was due to an understanding the marriage was to be kept a secret, that the notes written and signed by Zellah as " Zellah L. Keiner " as late as May 16, 1896, were so signed, but this could not be, for, according to appellee's witnesses, Mrs. Wetmore and her daughter Mary, E. B. Eldred nearly a month before the notes were written, had proclaimed the fact that he and Zellah were married in Washington city. It is contended, however, that the facts and circumstances shown are sufficient to raise the presumption that the marriage took

Opinion.

place some where; that it may have taken place in Virginia, the District of Columbia, or in Pennsylvania, but appellee having undertaken to prove that E. B. Eldred and Zellah Keiner were married in Washington city at a particular time, and the evidence being insufficient to establish such marriage, he cannot rely upon other facts and circumstances as the ground of presumption that a marriage may have taken place between the parties at some other and different time or place, the presumption in such a case being that the connection between the parties continued to be illicit until that presumption is overcome by distinct proof of marriage. *Barnum* v. *Barnum*, 14 Am. & Eng. Enc. L., 530; *Redgrave* v. *Redgrave*, 38 Md., *supra;* and *Blackford* v. *Crawford*, 3 Wall: 175. In the last named case the Circuit Court instructed the jury that if they should find that at any time Mr. Crawford and Elizabeth Taylor lived together as man and wife; that he acknowledged she was his wife, and always treated her as such, and the children which she bore during that time as his children, and permitted them to be called by his name, then the presumption of law is in favor of the legitimacy of said children. On appeal, the Supreme Court of the United States held the instruction to be erroneous, because " under such circumstances the law makes no presumption. The question to be determined was one of fact, and not of law. The facts referred to were part of the evidence. They were to be weighed against the countervailing evidence. They might, by possibility, all be true and yet no marriage have occurred, and the children all be illegitimate."

The cases decided by other tribunals and cited by the learned counsel for appellee in support of his contention as to the sufficiency of the evidence of cohabitation and repute to found a presumption of a marriage between the parties somewhere and at some time, are each of them cases in which the evidence is much stronger than in the case at bar.

The case of *Womack* v. *Tankersley*, decided by this court

(*supra*), is greatly relied on by appellee, but the facts in that case and the facts in the case before us bear but little resemblance. In fact, they are so far different that the former case may be conceded to have been rightly decided, and still be no authority in this case.

In that case the reputed husband had come to the mother, another of whose daughters he had formerly married, and asked for her daughter, Martha, in marriage. Being refused, he requested another sister to accompany them when they went away to be married. She having declined, he and Martha left, were gone ten days, and on their return they both said they had been married in the State of North Carolina; they cohabited as man and wife, until his return to the army on the 26th of June, 1863, and were recognized as such by the family. He was killed shortly after returning to the army, and in February, 1864, Martha gave birth to a child. Martha was recognized as the widow of Womack by her immediate family and the neighbors, also by the Confederate military authorities. The child by this, and the children by Womack's previous marriage, were raised together as brothers and sisters, and no question as to the fact of this marriage, nor of the legitimacy of the child was raised until 1879, the child then having grown to womanhood, and married, her mother and father having long before died. The evidence as to cohabitation and repute was all one way and founded on general, not singular, opinion.

Lapse of time is an element in such a case to be considered, but it is not an element in the case here, for it was within less than two years of the time when the marriage is said to have taken place that the witnesses are called to testify. They fail to prove a marriage. On the contrary, such facts and circumstances are shown as to prove that no marriage could have taken place, and that the declarations of E. B. Eldred that he was married to Zellah Keiner were the result of an after thought. Whether to shield her at her and her family's solicitation, or to quiet the

talk of his neighbors and maintain his own standing in the community, or for any other reason, makes no difference, as such admissions do not constitute marriage. To declare, upon the evidence in this case, that a marriage between E. B. Eldred and Zellah Keiner had taken place, would be to set at naught the statutes of our State declaring how marriages are to be solemnized, and punishing offenders against their provisions, in the interest of morality and society. Declarations of parties to a meretricious cohabitation, when made simply to cover up their shame or to conceal their immorality, are entitled to no weight when the question whether or not they have been lawfully married is to be determined, and the evidence in this case, in disproof of marriage, is altogether too strong to be overcome by the declarations of E. B. Eldred.

To believe that E. B. Eldred and Zellah Keiner were married on the 28th or 29th of June, 1895, and so conducted themselves for ten months that neither the members of her family, nor the servants nor employees about his home, nor their neighbors, had any impression that they occupied toward each other the relation of husband and wife is too severe a test of human credulity. Morality cannot be upheld and society protected as our institutions and laws demand, if our citizens are to be permitted to cover upon their immorality, and shield themselves against the condemnation of an indignant community, by declarations made after offending against morality and violating our laws. Our marital laws are plain and simple, not difficult to understand by the humblest citizen, and, except in cases where the proof is clear that the parties claiming to have entered into matrimonial union, have in fact done so, that their cohabitation has been matrimonial and not illicit, no presumption of a marriage arises. However much we may sympathize with one situated as is appellee, we can but construe the law as it is written, and cannot sustain the contention that he is the offspring of a valid marriage, in the face of the evidence clearly disproving it.

So solicitous for the welfare of the innocent offspring of an illicit cohabitation has the law-making power of our State been, that it is declared that " if a man having had a child or children by a woman shall afterwards intermarry with her, such child or children or their descendants, if recognized by him before or after marriage, shall be deemed legitimate, sec. 2553 of the Code; and by sec. 2554, it is declared that the issue of marriages deemed null in law shall nevertheless be legitimate. But, unfortunately, these statutes have no application to this case.

We have deemed it unnecessary to consider the question whether or not a common law marriage in Virginia would be deemed valid. In the first place, the evidence does not warrant the conclusion that a common law marriage was entered into between E. B. Eldred and Zellah Keiner, and in the next, according to Mrs. Wetmore's statement, such a marriage is made impossible, for she says that when she went to take her daughter home, Eldred told her she was his wife, and, taking from his bureau drawer a paper, said: " Here is your evidence, madam."

We are of opinion that the decree appealed from is erroneous and should be reversed and annulled, and this court will enter such decree as that court should have entered, dismissing appellee's bill.

*Reversed.*