# Wytheville.

## REYNOLDS AND OTHERS V. ADAMS AND ANOTHER.

### June 12, 1919.

1. MARRIAGE—*Proof of—Admissions and Cohabitation.*—Marriage is a civil contract, and its existence may be shown like that of any other fact. The production of the marriage registry, or certificate, or of a person present at its celebration, is not absolutely necessary. In a criminal prosecution the acts and admissions of the prisoner coupled with cohabitation and recognition is sufficient evidence of marriage to procure his conviction.

2. MARRIAGE—*Proof of—Admissions—Validity of Foreign Marriage.* —Such admissions of a prior marriage in another State are sufficient evidence of such marriage, without proving the marriage to have taken place agreeably to the laws of the State. Such admissions and acts are competent evidence not only of the fact of marriage, but also of its validity under the *lex loci contractus.*

3. MARRIAGE—*Proof of—Criminal and Civil Cases.*—In all cases where the issue is the existence of the fact of the marriage, the rule of evidence is the same in civil as in criminal proceedings.

4. MARRIAGE—*Presumption from Cohabitation.*—The presumption of marriage from cohabitation apparently matrimonial is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, marriage not concubinage, legitimacy not bastardy, where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence.

5. MARRIAGE—*Presumption from Cohabitation—Rebuttal.*—Cohabitation and repute do not constitute marriage. They are only evidence tending to raise a presumption of marriage, and, like any other presumption of fact, may be overcome by countervailing evidence.

6. MARRIAGE—*Proof of—Declarations—Cohabitation—Case at Bar.*— The declarations of a reputed husband and wife made in good faith concerning the *factum* of their marriage in another State, accompanied by cohabitation from the return of the

parties home from their marriage trip, the cohabitation immediately following the alleged marriage, accompanied by the general repute of marriage as soon after the inception of the cohabitation as such repute could be reasonably expected to arise, furnished evidence of the most convincing character of the existence of a legal marriage. Moreover, in the instant case, there was the admitted belief of the family, including members of it hostile to the marriage, that such marriage existed and their recognition of it until the death of the reputed husband notwithstanding such hostility.

7. MARRIAGE—*Evidence—Declarations.*— The declarations of a reputed husband and wife, made in good faith, that they were married in another State, are admissible as a part of the *res gestae* to show the existence of a legal marriage.

8. MARRIAGE—*Proof—Declarations—Cohabitation—Repute.* —Among the prominent features which characterize proof which is sufficient to establish that a valid marriage exists are the following, namely; that the declarations (which must, of course, have been deliberate and have been a part of the *res gestae*) were made in good faith; that the cohabitation must have been matrimonial, *i. e.*, in the relationship of husband and wife, and not of master and servant or in some other relationship; that the family recognition, where that exists, must have been *bona fide;* and the general reputation in favor of the marriage must have existed along with the cohabitation as soon after the inception of the cohabitation as it could be reasonably expected to arise.

9. MARRIAGE—*Marriage in Another State—Testimony of Clerk in Rebuttal.*—A New Jersey act provided that if the parties to a proposed marriage were non-residents of the State, a license should be obtained from the registrar of vital statistics, if there was such an officer, and if not, then from the clerk of the city, borough, town, etc. The clerk of the city in which the marriage in question was alleged to have taken place testified that his was the only office from which license to marry could be obtained, and that his marriage record did not show that a marriage license was issued from his office for the marriage of the parties in question. But he did not undertake to say that there was no office of registrar of vital statistics in that city, when the marriage in question was said to have occurred.

*Held:* That the testimony of the clerk does not furnish that "most cogent and satisfactory evidence" which is requisite to repel the presumption of marriage which arose in the instant case "from cohabitation apparently matrimonial."

10. MARRIAGE—*Proof—Introduction of Wife into Society.*—Where

neither the alleged husband nor wife moved at all in social life, it is manifest that the absence of proof of introduction of the woman into society by the man as his wife is immaterial.

11. MARRIAGE—*Assumption of Husband's Name.*—Where there is evidence that the alleged husband introduced his alleged wife to two merchants "as his wife," that her general reputation was that of being "his wife," and that a note was executed by her as his wife, it will be inferred that the reputed wife assumed her reputed husband's name, although there was no express proof to that effect, or to the contrary.

12. APPEAL AND ERROR—*Presumption in Favor of Judgment.*—The judgment of a court of competent jurisdiction will always be presumed to be right. And a party in an appellate court alleging error must show error, else the presumption in its favor will prevail.

13. APPEAL AND ERROR—*Presumption in Favor of Judgment—Confirming Commissioner's Report.*—A master commissioner's report confirmed by a decree upon conflicting evidence of depositions of witnesses taken before the commissioner in person, is entitled to great weight, and should not be disturbed unless clearly at variance with the result of the evidence.

14. PARTITION—*Account of Debts Against Testatrix from whom Property Derived.*—In a suit for partition of real estate it is not necessary that there should have been an account of debts against the personal estate of the testatrix under whose will the real estate was derived before there is a decree of sale thereof for partition.

15. PARTITION—*Charges Against the Estate not set up in the Pleadings.*—Where defendants in a partition suit made no assertion of any charge or lien in their favor on the real estate in question in their pleadings in the cause, it is not error for the decree to ignore the rights of defendants in this respect. The jurisdiction of the court below was limited to the issue made by the pleadings and the same is true of the jurisdiction of the Supreme Court of Appeals on appeal. Under section 2564, Code of 1904, as amended (4 Pollard's Code, p. 415), such defendants may assert any claim or lien upon the land they may have, if any, and if established, the proceeds of sale for partition may be applied thereto.

Appeal from a decree of the Circuit Court of King and Queen county. Decree for complainant. Defendants appeal.

*Affirmed.*

This is a suit for the sale of real estate for partition under section 2564 of the Code as amended (4 Pollard's Code of Virginia 1916). The bill was filed by the appellees, the first-named appellee an adult, claiming to be the widow, and the infant appellee, claiming to be the only child and heir at law of one Arthur Reynolds, a deceased brother of the appellants. Arthur Reynolds died intestate. The said widow, after his death, married again and is now Mrs. Adams.

The real estate, known as the "Mount" farm, was devised by the will of their mother to said Arthur Reynolds and Mary Reynolds, the latter being one of the appellants. The will also contained a bequest of *"too* hundred dollars a *peac"* to T. C. and E. M. Reynolds, the two other appellants, and provided that the latter "must not push them" (meaning Arthur and Mary Reynolds) "for the money till they can pay it. * * * and if Taylor " (meaning T. C. Reynolds) *"eve* get *disable* and wants a home Arthur and Mary to see after *hime* and to see that he is *card* for."

There was no assertion of any charge or lien on the real estate by T. C. Reynolds or E. M. Reynolds under the provisions of said section 2564 of the Code as amended. They filed their joint and separate answer to the bill along with said Mary Reynolds, and the only matter upon which they took issue with the bill or made any issue in the cause was upon the question of fact as to whether said Arthur Reynolds was ever legally married to the said adult appellee. This fact the appellants, in their answer, denied, and they therein took the position that the said adult appellee was never a lawful wife, and therefore was not entitled to any dower interest in the share of Arthur Reynolds in said real estate, and that the said infant appellee, her child, was not the legitimate child of said Arthur Reynolds and, hence, did not inherit from him any interest in such real estate.

In her deposition in the cause, the adult appellee testifies

that when she was twelve years old she went to live with the mother and sister of Arthur Reynolds at the "Mount" farm (which was then and thereafter also the home of Arthur Reynolds). That she went with the latter from such home to be married. (This was in August or September of 1911, as appears from other testimony in the cause.) That they went first to Richmond, then to Petersburg. That they were not married at these places because they could not get a license and had to come back to said home. That they then went to Tappahannock. That Arthur Reynolds was with her and no one else. That they took boat at Tappahannock and that he carried her to Camden, N. J., as she understood. That they "were married there." That on this journey from Tappahannock to Camden they changed boats and also rode on cars. That from Camden he took her to Philadelphia, 1235 north Tenth street, to the home of his cousin, Mrs. Mary Leader. That they stayed there for four months. That they came back to "Mount" farm in Virginia. That they thereafter lived on such farm up to the time of Arthur Reynolds' death (which occurred in the year 1914, as shown by other evidence in the record). That while in Philadelphia and after they returned to "Mount" farm, Arthur Reynolds always recognized her as his wife. That the infant appellee was born at "Mount" farm about thirteen months after the time of the marriage aforesaid. That from her birth up to the time of his death, Arthur Reynolds recognized the infant appellee as his child. That witness could not give the date, but that she and her husband were married on a Sunday morning, when they had just gotten to Camden. That she does not think that they were married at the station. That (to use the words of witness) "it was in front of a large brick building that was fenced around with iron fencing such as we have around cemeteries, only it was a stronger fence." That she did not know who married them. That when they got to Camden, Reynolds left

her standing in the yard and went into the building mentioned. That she could not tell how long he was gone, but it was not very long. That after an absence of, she supposed, fifteen or twenty minutes, probably longer, he returned. That (to again use her own words) "there was a man with him when he came back who married us. As near as I can get at it, he was dressed as if he were a preacher." That she did not know where Reynolds got the license or whether he did get a license, but that Reynolds "always said he had one, and if necessary he would show it."

That when witness and her husband returned from Philadelphia the appellants visited their home at "Mount" farm and treated witness as the wife of Arthur Reynolds.

No other witness testified to the *factum* of the marriage in question.

There were two other witnesses for appellees and a number of witnesses for appellants, including the testimony of all three of appellants themselves, none of whom had any personal knowledge on the subject of the marriage in question. While there is some conflict in such testimony for appellants with that of the said adult appellee and of the other witnesses for appellees, it may be safely said that the preponderance of all the testimony in the cause establishes in a convincing way the following facts, namely:

That upon their return from the Camden trip and after living in Philadelphia, as stated by the adult appellee in her testimony, both the latter and Arthur Reynolds made declarations that they were married and that they had been married in Camden, N. J. That they lived together in Philadelphia at the home of Arthur Reynolds' cousin for about four months immediately following the alleged marriage, and afterwards at "Mount" farm, as man and wife, and from thence on in the same relationship until Arthur Reynolds' death, a period of about three years. That their general reputation in the community of "Mount" farm during the

time they lived there was that they were lawfully married. That such living together was accompanied by declarations from time to time by both Arthur Reynolds and his reputed wife that they were married. That Reynolds both publicly and privately during the whole of this time, both in Philadelphia and at the farm, recognized and treated his reputed wife as his lawful wife. That even the appellants believed until after the death of Reynolds that he and his reputed wife were lawfully married.

That appellants, during the lifetime of Reynolds, after the return from Philadelphia aforesaid, visited in their home—the appellant Mary Reynolds living there a part of the time—believed, as aforesaid, that Reynolds and his reputed wife were married and recognized and treated them as married people.

The testimony shows, however, that both before and after the reputed marriage there was some hostility of feeling existing between the appellants and the adult appellee, and the former from time to time questioned her rather closely as to where and when she was married, and by the time of their brother Arthur Reynolds' death or soon afterwards, the appellants had about convinced themselves that no legal marriage had ever been solemnized, or at least they had become skeptical on the subject and felt that the reputed wife could not prove any such marriage and that she was not entitled to any share in their deceased brother's estate until she did prove it.

That such hostile feeling existed on the part of appellants is clearly shown in various ways by the record. To illustrate: one witness testifies that when Arthur Reynolds, on the return from Philadelphia, told him that he and his reputed wife were married, Reynolds said: "They can kick as much as they please, but it is all over now." And, in connection with the controversy over whether the reputed wife was entitled to any share of the personal estate of Ar-

thur Reynolds after his death, appellants claim that the reputed wife then admitted that she had never been married to their deceased brother. Indeed, one of appellants testifies positively that she made such admission to the sheriff, who was the administrator of Arthur Reynolds' estate, and that she stated to such administrator that she could not claim any share of such estate. But the testimony of the administrator clears up this matter. His testimony on that subject is as follows: "She told me that she had thought that she was married to Arthur Reynolds, but that those people" (meaning appellants) "had accused her of not being married to him and she was afraid that —— could not prove it. She said she left home to get married and had never traveled before, went to several cities and stood up before what Mr. Reynolds said was a preacher, but she could not say even what city that was, only what he told her." And it is apparent from the testimony of such administrator that she did not claim any share in the personal estate because of what she then felt was her lack of proof of her marriage, not because of any admission that the marriage had not in fact occurred.

And the last-mentioned witness throws further light upon the case in his answer to the question as to whether or not Arthur Reynolds ever admitted in his presence that said reputed wife was his wife. That answer is as follows: "He did. I went to his home to serve a warrant on him for Mr. Taylor Reynolds" (who is T. C. Reynolds, one of appellants), "and he said he had practically lived in hell ever since he married that woman, and if I wanted to know the bottom of the whole matter, that was it. The family were mad with him because he married her."

There is some testimony for appellants to the effect that said reputed wife made inconsistent statements at times when she was being questioned as to where the marriage was solemnized, but such testimony bears internal evidence

that such statements as to the place of the marriage were either made in joke or were misunderstood; and it is significant that all of such testimony shows that the reputed wife· at all times, and consistently, stated that she was married and married on the Camden trip, before the return aforesaid to the farm, and such testimony shows that whenever the subject was seriously talked of she adhered to the statement that she was married at Camden, N. J., as the place was called by her reputed husband.

There is testimony for appellants relied on by them to show that an illicit relationship existed between Arthur Reynolds and the adult appellee before their reputed marriage, from which the inference is sought to be drawn that the subsequent reputed marriage was but a cloak for the continuance of such relationship, and there is oral testimony in the record to the effect that a warrant of some kind was sworn out by the father of the adult appellee just before she and Arthur Reynolds left home in 1911 to be married.  But the warrant seems to have been lost or destroyed; at any rate, it is not produced; its contents are not proved, and the evidence on the subject falls far short of establishing the existence of the illicit intercourse claimed by appellants to have existed.  And there was no prosecution of the warrant, nor of any such charge, after such reputed marriage.  On their return home aforesaid, the parties lived openly together as man and wife until the death of the reputed husband, as aforesaid, unmolested by prosecution or any charge of illicit cohabitation, and were visited and regarded by appellants themselves as lawfully married, although they were hostile to the reputed wife, as aforesaid.

On the *factum* of the marriage, the appellants have introduced in evidence the deposition of the person who was city clerk of Camden, N. J., and had been such for a period of seven years, including the year 1911.  He testified on April

2, 1917, and his testimony is to the effect that his office is the only office in the city of Camden, N. J., from which license to marry can be obtained; that his marriage record does not show that a marriage license was issued from his office for the marriage of the parties in question; that his office is not open on Sundays, and that it is not customary to issue marriage licenses on Sunday.

The statute of New Jersey on the subject (Acts 1910, p. 477, sec. 3) provides as follows: "If both of the parties to the proposed marriage are non-residents of the State, such license shall be obtained, if the proposed ceremony is to be performed within any city, borough or municipality of this State, from the registrar of vital statistics, if there be such officer, and if not, then from the clerk of such city, borough, town or other municipality."

There was a decree of reference in the cause for inquiry and report, among other things, upon who are the heirs of Arthur Reynolds, deceased?

There was no inquiry or report of the personal estate of said testatrix or of the debts or demands against it or against the estate of Arthur Reynolds, deceased, or of the liens resting upon the real estate aforesaid.

There was a master commissioner's report filed in execution of said decree of reference, by which it was reported, among other things, that the heirs of Arthur Reynolds are a daughter, who is the infant appellee, and a widow, who is the adult appellee.

The appellants filed but one exception to the commissioner's report, and that was to the report therein that the infant appellee is an heir of Arthur Reynolds, and that the adult appellee is his widow, and allege that the latter was never legally married to Arthur Reynolds and that hence she is not his legal widow and that said infant is not his legitimate child.

The decree under review overruled said exception and

confirmed such report; ascertained the interests of appellees in the real estate aforesaid accordingly and decreed a sale of the land for partition.

*Isaac Diggs* and *J. W. Fleet,* for the appellants.

*H. I. Lewis, J. D. Mitchell* and *G. B. White,* for the appellees.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

The assignments of error raise the questions which will be considered and passed upon in their order as stated below.

1. Does the preponderance of the evidence in the cause establish that there was a valid marriage of Arthur Reynolds and his reputed wife, the adult appellee, under the statute law of New Jersey?

As said by this court in *Womack* v. *Tankersley,* 78 Va. 242:

[1, 2] "Marriage is a civil contract, and its existence may be shown like that of any other fact. The production of the marriage registry, or certificate, or of a person present at its celebration, is not absolutely necessary. In a criminal prosecution, the acts and admissions of the prisoner, coupled with cohabitation and recognition, is sufficient evidence of marriage to procure his conviction. *Warner's Case,* 2 Va. Cas. (4 Va.) 95; *Oneale's Case,* 17 Gratt (58 Va.) 582.

"* * * Such admissions of a prior marriage in another State are sufficient evidence of such marriage, without proving the marriage to have taken place agreeably to the laws of the State. Such admissions and acts are competent evidence not only of the fact of marriage, but also of its

39

validity under the *lex loci contractus.* *Rex* v. *Inhabitants of Brampton,* 10 East R. 282; *Hemmings* v. *Smith,* 4 Douglas R. 33; 3rd Waterman's Archibold 613; and *Bird's Case,* 21 Gratt. (62 Va.) 800.

[3] "And the same authorities establish that in all cases where the issue is the existence of the fact of the marriage, the rule of evidence is the same in civil as in criminal proceedings."

The case quoted from was a civil case, being a suit for partition of real estate, and involved the question of the legitimacy of the plaintiff. The only evidence to prove the marriage of her father and mother was that the father asked for the mother in marriage, and, being refused, requested a sister to accompany them when they went away to be married, and the sister declining to go, they went away from home to be married; were gone ten days; on their return, they both said they had been married in the adjoining State of North Carolina; they cohabited as man and wife a few days until the return of the father to the Confederate army, and were recognized as such by the immediate family; the father being wounded in battle, died about a month thereafter, without ever returning home; the following February the mother gave birth to the plaintiff; the mother was thereafter recognized as the widow of the deceased soldier by her immediate family and by the Confederate military authorities, from whom, as such widow, she drew rations, and the plaintiff was from her birth recognized as the legitimate child of her father by such immediate family. But a brother of her deceased mother appeared as a witness in the case, and, as said in the opinion of the court, testified "to facts, in the most positive manner, which, if true, fixed upon his aged mother the crime of perjury, and upon his dead sister the character of a public prostitute, and upon his own niece * * * the stigma of illegitimacy. His testimony is not only positive that there was no such

marriage * * * as claimed, but he states as facts things
which, if true, would tend strongly to establish that it was
a physical impossibility; facts directly in conflict with his
mother and sister; * * *." It further appears in that
case that the next year after the death of the father there
was a qualification of a guardian of the plaintiff and of two
children of her father by a prior marriage and in the guar-
dianship bond the three children were styled "the orphans
of C. H. Womack, deceased"—the father aforesaid. On this
bond the brother, who was the adverse witness aforesaid,
was surety. The mother of the plaintiff, that same year,
namely, the year next following the birth of the plaintiff,
executed, acknowledged and recorded a deed relinquishing
in favor of said three children her dower interest in the
lands of which the father died seized and possessed; and
thereafter made a second marriage and subsequently died.
There was other evidence for defendants which is not set
out in the report of the case, but as to which the court says
in its opinion, "* * * it is, in its character, pointedly in
conflict with the evidence favoring the marriage, though
circumstances were elicited which strongly tend to dimin-
ish its force in respect to credibility and viewed as a whole
it is insufficient to satisfy us that the decree complained of
is plainly wrong."

This court, in such case, affirmed the decree of the court
below, holding that the proof established that the marriage,
which took place in another State, was a legal marriage.

[4] As said by this court in the case of *Eldred* v. *Eldred,*
97 Va. at p. 625, 34 S. E. at p. 484 (which was also a suit
for partition of real estate): ."The presumption of mar-
riage from cohabitation apparently matrimonial is one of
the strongest presumptions known to the law. This is espe-
cially true in a case involving legitimacy. The law presumes
morality, marriage not concubinage, legitimacy not bas-
tardy, where there is enough to create a foundation for the

presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. *Haynes* v. *McDermott,* 91 N. Y. 451 [43 Am. Rep. 677]."

[5]    It is also true, however, as said in the last-cited case (*Harrison's Adm'r* v. *Garnett,* 97 Va. at p. 699, 34 S. E. at p. 478), that "* * * cohabitation and repute do not constitute marriage. They are only evidence tending to raise a presumption of marriage, and, like any other presumption of fact, may be overcome by countervailing evidence. *White* v. *White,* 82 Cal. 427, 23 Pac. 276, 7 L. R. A. 801; *Cartwright* v. *McGowan,* 121 Ill. 388, 12 N. E. 737 [2 Am. St. Rep. 105] ; *Waddingham* v. *Waddingham,* 21 Mo. App. 609; *Barnum* v. *Barnum,* 42 Md. 296; and *Com.* v. *Stump,* 53 Pa. St. 132 [91 Am. Dec. 198]." See to the same effect, 26 Cyc. 882-3, 888. And in *Eldred* v. *Eldred,* this court held that the evidence therein was insufficient to raise the presumption of a legal marriage. But there the cohabitation as man and wife did not follow immediately upon the alleged marriage trip. The relation of the alleged wife to the alleged husband before such trip was that of housekeeper, and continued to be such for about a year after such trip and until it had come to the ears of the alleged husband that his neighbors were talking of their living improperly together; and it was not until it was evident that a child was about to be born that declarations were made by the alleged husband that they had been married. No excuse was given in evidence for the keeping of the alleged marriage a profound secret till the conduct of the parties had given rise to a scandal in the community. There was no general reputation of marriage accompanying the cohabitation, as soon after its inception as such reputation could be reasonably expected to arise; and the rule was applied that "cohabitation alone is not sufficient proof of marriage nor sufficient to raise the presumption of marriage." *Eldred* v. *Eldred, supra,* 97 Va. at p. 626, 34 S. E. at p. 484. On the contrary,

in that case the general reputation of the parties was that
they were not married, until after the alleged husband set
about silencing the neighborhood gossip by the expedient
of alleging the existence of a marriage, as aforesaid.
Moreover, in that case it was clearly proved that the cohab-
itation in its beginning was illicit, and the presumption was
applied that such a cohabitation is presumed to continue to
be illicit "until that presumption is overcome by distinct
proof of marriage," citing authorities. And there were
other facts in that case which not only seriously impeached
the good faith of the declarations of the alleged husband and
wife concerning the existence of a marriage, but also the
.good faith and credibility of important witnesses who tes-
tified in support of the marriage. And the proof by the
clerk of the court in Washington, having official charge of
such matters, was unequivocal that no license was issued
in Washington for the marriage of these parties.

[6, 7] We come now to the application of the law to the
facts of the case before us. Those facts, so far as deemed
material, appear from the statement preceding this opin-
ion. We are of opinion that in this case the declarations of
the reputed husband and wife concerning the *factum* of the
*marriage* were made in good faith and not to serve an ul-
terior purpose, as in *Eldred* v. *Eldred, supra,* 97 Va. 606,
34 S. E. 477. And such declarations accompanied the co-
habitation from the return of the parties home from their
marriage trip, and, unlike the *Eldred* v. *Eldred* case, the co-
habitation immediately following the alleged marriage was
matrimonial, and such cohabitation was accompanied by
the general repute of marriage as soon after the inception
of the cohabitation as such repute could be reasonably ex-
pected to arise. And being made in good faith, such dec-
larations furnish evidence of the most convincing charac-
ter of the existence of a legal marriage, and having been
made as a part of the *res gestae,* they were admissible in

evidence for that purpose. Moreover, in the case before us, there was the admitted belief of the family, including members of it hostile to the marriage, that such marriage existed and their recognition of it until the death of the reputed husband, notwithstanding such hostility.

[8] The question under consideration is not free from difficulty. The case is one near the border line between validity and invalidity of marriage depending for proof upon the presumption arising from reputation and recognition of marriage. As appears from the authorities on the subject, among the prominent features which characterize proof which is sufficient to establish that such a valid marriage exists are the following, namely: that the declarations (which must of course have been deliberate and have been a part of the *res gestae*) were made in good faith; that the cohabitation must have been matrimonial, i. e., in the relationship of husband and wife, and not of master and servant or in some other relationship; that the family recognition, where that exists, must have been *bona fide;* and the general reputation in favor of the marriage must have existed along with the cohabitation as soon after the inception of the cohabitation as it could be reasonably expected to arise. As appears from the statement preceding this opinion, all of these features were present in the case under consideration. We cannot say, therefore, that the court below was wrong in its conclusion that the marriage in question was a legal and valid marriage.

[9] It is true that the testimony of the city clerk of Camden set forth in the statement above goes very far towards proving that no marriage license was obtained for or existed at the time of the alleged marriage. But the testimony of the clerk is not unequivocal. His testimony, when closely examined, goes no farther than saying that his office was the only office in the city of Camden, N. J., from which license to marry could be obtained at the time he testified,

which was on April 2, 1917.  He does not undertake to say that there was no office of registrar of vital statistics in that city in 1911, when the marriage in question is said to have occurred.  And, as noted in the above statement of facts, the statute of New Jersey on the subject designated the registrar of vital statistics of Camden as the proper officer to issue such a license as that in question, and only in event that no such officer existed was the clerk authorized to issue the license.  Moreover, conclusions, such as that aforesaid embodied in the testimony of the clerk, to the effect that no one else had the authority to do a certain act, are so patently matters of opinion and of opinion so general in its nature that they do not furnish very satisfactory or convincing evidence, even when admitted in evidence without objection, especially when they are not explicit as to time.  Hence we are of opinion that said testimony of the clerk does not furnish that "most cogent and satisfactory evidence" which is requisite, as aforesaid, to repel the presumption of marriage which arose in the case before us "from cohabitation apparently matrimonial."

[10]  It is further urged in behalf of appellants that there is no evidence in the cause that the alleged husband introduced the alleged wife into society as his wife.  This is true, if by society is meant social life.  And it is also true that there are authorities which hold that the fact that the man introduces the woman in society as his wife is a fact to be considered as evidence of marriage.  26 Cyc. 883; *Robinson* v. *Robinson*, 188 Ill. 371, 58 N. E. 906.  But plainly this cannot be an essential element of proof of marriage in such cases as that which we are considering.  Where there is the introduction of the woman into social life by the man, whether he introduced her as his wife or as occupying some other relationship to him, would, of course, be a very pertinent fact.  But where neither the alleged husband nor wife moved at all in social life, as was true of such parties in

the cause before us, it is manifest that the absence of proof of introduction of the woman into such society by the man is immaterial.

[11] It is further urged in behalf of appellants that there is no evidence in the cause that the reputed wife assumed her reputed husband's name. There is indeed no express proof of this. But it seems a necessary inference from the testimony in the cause. It is difficult to escape the inference from the proof in the record, which is that Arthur Reynolds introduced the adult appellee to two merchants "as his wife"; that her general reputation was that of being "his wife"; and especially from the testimony of one of such merchants to the effect that after the death of Arthur Reynolds a note was given in his favor for a debt the deceased owed him and for clothes for deceased to be buried in, which note was executed "by his wife" and another person. And no point seems to have been made anywhere in the pleadings or in the taking of depositions that the alleged wife did not bear the name of her alleged husband from the time of their alleged marriage, until she married the second time. And the consideration of the fatal effect upon the cause of the appellees of her bearing a different name during such time and of the ease with which such a fact could have been expressly shown by appellants, if it were a fact, is convincing to our minds that no such fact existed. The frequent reference in the record to the adult appellee as "Mrs. Adams" is explained, of course, by the fact that she had married a second time and was Mrs. Adams when the suit was instituted and when the depositions were taken.

On the whole, we are not satisfied that there is any error in the decree under review upon the question we have under consideration.

[12] As said by this court in the case of *Womack* v. *Tankersley, supra* (78 Va. 242): "The judgment of a court of competent jurisdiction will always be presumed to be

right. And a party in an appellate court alleging error must show error, else the presumption in its favor will prevail."

Again, in *Shipman* v. *Fletcher*, 91 Va. 487, 22 S. E. 463, this court said: "The judgment of a court of competent jurisdiction is entitled to great weight. It is always presumed to be right until the contrary is shown."

[13] And in the cause before us we have not only the decree of the court below, in appellee's favor upon the question under consideration, but such a decree confirming a master commissioner's report so holding upon conflicting evidence of depositions of witnesses filed along with the record, as appears from the decree under review, from which we infer that such evidence was taken before the commissioner in person, although there are no captions to the depositions or certificates of the taking of the depositions to disclose what is the fact as to this matter. If the latter be the fact, the rule is well settled that the report of the commissioner is entitled to great weight and should not be disturbed unless clearly at variance with the result of the evidence. *Cottrell* v. *Mathews*, 120 Va. 847, 92 S. E. 808.

The question under consideration must, therefore, be answered in the negative.

Having reached this conclusion, it becomes unnecessary for us to consider the question of whether there was a common law marriage in the case under review, or whether if there was it would be recognized under the laws of this State.

But two questions remain for our consideration.

[14] 2. Was it necessary that there should have been an account of debts against the personal estate of the testatrix under whose will the real estate was derived before there was a decree of sale thereof for partition?

This question must be answered in the negative.

The cases of *Bowden* v. *Parrish*, 86 Va. 67, 70, 9 S. E.

40

616, 19 Am. St. Rep. 873; *Hoge* v. *Junkin,* 79 Va. 220, 230-1, and *Neathery* v. *Neathery,* 114 Va. 650, 77 S. E. 465, are cited for appellants on this question. They are all cases for the sale of land to satisfy debts, and have no application to suits for partition of real estate.

[15]  3. Was it error in the decree under review to ignore the rights of the appellants; T. C. Reynolds and E. M. Reynolds, under the will aforesaid, which gave them a legacy of $200.00 each and made the provisions set forth in the statement preceding this opinion with respect to such legacies and as to a home for T. C. Reynolds in the contingencies named in the will?

We deem it sufficient to say with regard to these matters that, if there was any existing charge upon the real estate in the will mentioned or any lien thereon in favor of or belonging to these appellees, they have not as yet asserted any such claim in their pleadings in the cause.

Under section 2564 of the Code as amended (4 Pollard's Code, p. 415), such appellees may yet assert any claim or lien upon the land they may have, if any, and if established, the proceeds of sale for partition may be applied thereto.

There was no error in the decree under review in that it did not go outside of the issues in the cause to protect rights of parties thereto asserted in argument, but not in the pleadings therein. The jurisdiction of the court below was limited to the issues made by the pleadings, and the same is true of our jurisdiction on appeal.

For the foregoing reasons, we are of opinion to affirm the decree complained of.

*Affirmed.*