𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

## W. A. CYPHERS V. J. B. DINGUS.

September 22, 1921.

1. DEEDS—*Cancellation—Fraudulent Representations by Grantee—*
   *Case at Bar.*—Complainant conveyed thirteen acres of land to
   a trustee for one C. On the same day the trustee conveyed
   the thirteen acres to defendant, receiving in exchange a deed
   from defendant for other property. The instant suit was
   brought by complainant to have the deeds canceled on the ground
   that defendant, acting for himself and for C, procured from
   complainant the deed for the thirteen acres by false repre-
   sentation, and in pursuance of a fraudulent scheme between
   defendant and C, whereby the subsequent exchange was to
   be made. The alleged fraudulent representations were as to
   the value of a note owned by C and given by him as consid-
   eration for the deed for the thirteen acres. The transaction
   was unusual, and the circumstances by which it was sur-
   rounded rendered it suspicious in itself.

   *Held:* That, while the evidence was conflicting and the parties
   and their respective witnesses squarely contradicted each other,
   the circumstantial evidence, independent of the presumption
   in favor of the finding of the lower court, turned the scale in
   favor of complainant.

2. AGENCY—*Confidential Relationship—Duty of Disclosure—Case at*
   *Bar.*—In the instant case, defendant was claiming to act as
   agent for complainant in selling complainant's land to a third
   party, and on the day of the sale defendant made an exchange
   with this third party of property of his for the property sold
   by complainant to the third party. While there was nothing
   inherently wrong in making such an exchange, it was hardly
   consistent with the confidential relationship of agency to with-
   hold from complainant the fact that defendant, and not the
   third party, was to get the property conveyed by complainant.

3. DEEDS—*Cancellation—Fraud—Burden of Proof.*—In a suit for
   the cancellation of a deed on the ground of fraudulent repre-
   sentations by grantee, the presumption is in favor of inno-
   cence and not of guilt. One who charges fraud as a ground
   of relief must prove it by strong and clear and convincing

91

evidence. This is especially true where the contract in question has been consummated by the delivery of the deed.

4. FRAUD—*Proof of Fraud—Preponderance of Evidence—Circumstantial Evidence—Cancellation of Deed.*—It often happens that the question of fraud depends as much upon circumstances as upon the statements of parties directly concerned. The mere fact that the oral testimony relating directly to the execution of a deed is equally balanced in point of the number of witnesses testifying for and against its fair execution does not necessarily mean that an attack upon the deed must fail for want of a preponderance of evidence to establish fraud.

5. FRAUD—*Burden of Proof—Degree of Proof Required to Establish Fraud.*—According to the overwhelming weight of authority, fraud need not, like the guilt of the accused in a criminal prosecution, be established beyond a reasonable doubt. A preponderance of evidence, as in any civil case, is sufficient, provided the proof is clear and strong enough to preponderate over the general and reasonable presumption that men are honest and do not ordinarily commit fraud, and reasonably to satisfy the understanding and conscience of the judge and jury. If it does this, it is sufficient both at law and in equity.

6. APPEAL AND ERROR—*Reversal—Presumption of Correctness of Judgment or Decree—Appellate Court Must be Fully Satisfied that Decree is Wrong.*—Where the Supreme Court of Appeals is unable, after a thorough examination of all the evidence, to find enough evidence to justify it in holding that the decree of the lower court was wrong, there can be no reversal, and, of course, the same is true where the court is reasonably satisfied that the decree complained of is right. The Supreme Court of Appeals sits as a court of review, the decree comes to it with a presumption of correctness, and it ought not to be reversed unless the court is fully satisfied that it is wrong.

Appeal from a decree of the Circuit Court of Wise county. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Fulton & Vicars,* for the appellants.

*Bond & Bruce,* for the appellees.

KELLY, P., delivered the opinion of the court.

[1] On April 5, 1916, J. B. Dingus conveyed to J. J. Moore, trustee, two small tracts of land containing in the aggregate about thirteen acres. On the same day J. J. Moore, trustee, conveyed this land to W. A. Cyphers, and received in exchange therefor a deed from Cyphers for a house and four lots known as the "Buchanan property," and two other lots known as the "Oates Cyphers" lots. The decree appealed from, rendered in a suit brought for the purpose by Dingus, set aside and cancelled all three of these deeds and undertook to place the parties as far as possible *in statu quo* by directing a commissioner to reconvey the respective properties to Dingus and Cyphers.

The ground upon which Dingus sought to have the deeds cancelled was that Cyphers, acting for himself and for one H. C. Cornett, procured from him the deed for the thirteen acres by false representation, and in pursuance of a fraudulent scheme between Cyphers and Cornett, whereby the subsequent exchange was to be made.

There are no new or novel questions involved, and the decision of the case depends wholly upon the sufficiency of the evidence to support the charge of fraud on the part of Cyphers in procuring the deed from Dingus.

The evidence is voluminous and in many respects conflicting. We shall first state briefly what, as we think, may fairly be called the undisputed facts material to the controversy:

Dingus, Cyphers and Cornett all resided at or near the town of Coeburn. Dingus and Cyphers were acquaintances and neighbors of long standing. Dingus was a laboring man not much experienced in trading, but was intelligent and thrifty, and in addition to the property here involved owned a tract of about twenty-nine acres worth perhaps several thousand dollars.

Cyphers was a dealer in real estate, on his own account and as agent for others, owned a good many properties, and was an experienced trader.

Cornett had lived at Coeburn only a short time, was not well known there, but so far as known was generally regarded as something of an adventurer, and of rather uncertain credit and standing. He was the owner of two negotiable notes of $2,000, executed to him by F. A. and A. C. Shuyler, of Cornelia, Ga., as an advance payment on lumber which Cornett and his associates were to manufacture for the Shuylers.

Cornett had deposited one of these notes with the Miners Bank of Commerce at Coeburn as collateral security for a loan of $500 from that bank, but he was pressed for money, and for some time prior to April 5, 1916, had been making continued and strenuous efforts to exchange one or both notes for real estate. He had a number of opportunities to exchange the notes for land at prices acceptable to him, but all of the owners of such lands refused to take the notes as cash and insisted on retaining a lien to secure the amount in case the notes were not paid. Cornett would not trade that way, giving as his reason that he needed money, and would want to procure a loan on the property, which he could not do if a vendor's lien thereon was retained.

Mr. C. O. Ramsey, cashier of the Miners Bank of Coeburn, had in former years known Mr. F. A. Shuyler in North Carolina, and regarded him from the reputation he bore there as an honest and upright man, but Ramsey did not know how he was rated in point of financial worth. About the time the Miners Bank made the $500 loan to Cornett, Ramsey had some correspondence with the Shuylers and with a bank at Cornelia, Ga., in regard to the notes held by Cornett, and as a result had been informed by the Shuylers that the notes were genuine and good, and would be paid at maturity; and had also been informed by the bank that the Shuylers had been fairly good customers and were regarded as honest and reasonably safe.

Cyphers was one of the men, and, indeed, seems to have been the principal one, whom Cornett had endeavored to interest in a trade for the notes, and their negotiations had embraced properties owned by Cyphers individually, as well as properties owned by third persons. Cornett had referred Cyphers to Ramsey for information as to the Shuyler notes, and while Ramsey would not take the responsibility of advising Cyphers to trade for them, he gave him the information in regard thereto above recited, and Cyphers says he reached the conclusion that the notes were good, and was willing to risk his judgment on them in a trade which he was trying to make with Cornett for land owned jointly by Cyphers and his brother in West Virginia. This latter trade was pending and awaiting communication by Cyphers with his brother in West Virginia when the sale was made by Dingus to Cornett. There were also other negotiations pending at that time respecting various other properties between Cornett and Cyphers and between Cornett and others.

Some little time before the trade was made with Dingus, Cyphers and Cornett had looked at the twenty-nine acre tract owned by the former, and Cornett seemed to be favorably impressed with it. It seems that they had also at the same time seen the two tracts which we have referred to as the thirteen acres. Shortly thereafter Cornett came to the N. & W. pumphouse where Dingus worked every day, introduced himself to Dingus, talked to him in a general way about how land was selling in the community, and told him that Cyphers wanted to see him. Still later, but in a very short time, Cyphers went to see Dingus and tried to purchase the twenty-nine acre tract from him, and in the course of the negotiations told him that he thought he could sell that tract to Cornett. Cyphers says he was trying to buy this land on his own account and turn it over to Cornett at a profit, but the mere fact that they were nego-

tiating, and that Cornett was named as a probable buyer, is all that need be mentioned here, with the addition that the negotiations were abandoned because certain infant heirs had an interest in the twenty-nine acres, and the title thereto was not marketable.

A day or two later Cornett saw Dingus at Kilgore's store and asked for a price on the thirteen acres. Dingus named $2,000 as the price, and Cornett said Cyphers would see him about it.

While there is a direct conflict of testimony as to the circumstances under which Cyphers and Dingus next met, the parties agree that a day or two later they did meet at the pump house, discussed the exchange of the thirteen acres for one of Cornett's $2,000 notes, and on the same day Dingus conveyed these tracts to Moore, trustee, for Cornett, in consideration of the $2,000 note, and that Dingus paid Cornett $100, which went to him as his compensation for helping to make the deal. It is also admitted that Cyphers prepared all three of the deeds involved in this litigation, that at the time Dingus acknowledged and delivered his deed to Moore, trustee, Cyphers had the two other deeds in his pocket, and that they were all three executed and delivered the same day, although it seems clear that Dingus did not at the time know anything about the exchange. The Buchanan property, which Moore, trustee, got by virtue of the exchange, was one of the properties which Cyphers had offered to Cornett, and about which they had been negotiating just prior to the time of the Dingus trade.

Some time in the afternoon of the day on which Dingus delivered the deed to Moore, trustee, he took the note to Coeburn to place it in the First National Bank, where he kept an account, and was there given information which made him uneasy about its value. He asked Cyphers to endorse it, and upon his refusal brought this suit.

Up to the time of the trade with Dingus nothing more was known about the Shuyler notes than was indicated in the information possessed and given out by Ramsey at the Miners Bank. It developed shortly afterwards that Cornett defaulted in his contract with the Shuylers, and, furthermore, that they, as well as Cornett, either were or soon became insolvent, and the notes were wholly worthless.

It is difficult for us to reach an entirely satisfactory conclusion in this case. Cyphers denies having made any representations to Dingus about the notes, and claims that he abandoned all his own negotiations with Cornett at the earnest solicitation of Dingus, who, as he claims, was acting independently, had started negotiations with Cornett, and employed him to help complete the trade. He has given an intelligent and clear deposition, which standing alone makes a complete defense to all the charges against him.

On the other hand, Dingus has testified without qualification to the effect that he had offered Cornett the land for $2,000, and after Cornett had said that he would see Cyphers about it, the latter came up to his place of work, said he had come to close the trade, and represented the note to be good, saying (in response to a statement by Dingus that he did not know anything about the Cornett notes): "They are absolutely gilt edge and good and will be paid at maturity; I have investigated the note thoroughly myself and know what I am talking about." Further on in his deposition Dingus says again: "I traded for the note from Cyphers; took his word and honor. He recommended the note to be gilt edge and good and worth one hundred cents to the dollar."

Upon many of the details and circumstances bearing upon the execution and delivery of the deed Dingus and Cyphers and their respective witnesses squarely contradict each other. It is not easy to say where the preponderance of evidence lies. Both Dingus and Cyphers are contradicted by other

witnesses as to certain statements made by them, but it is perhaps fair to say that the circumstantial evidence, independent of the presumption in favor of the finding of the lower court, turns the scale in favor of Dingus.

The transaction in itself is unusual, and the circumstances by which it is surrounded or set about render it suspicious in itself. Cyphers evidently thought the notes were probably good, but he knew that they were risky. He was a real estate trader; he knew Cornett better than Dingus knew him, and he knew that Cornett was anxious to trade the notes for real estate without the retention of a lien. For weeks Cornett had been diligently trying to buy land from or through him on just the terms he got from Dingus, and had failed. The record leaves no room to doubt, and Cyphers must have known, that Cornett was willing to let the notes go for less than their face value, if he could get in exchange therefor a deed for real estate without a lien retained to secure the payment of the note. Indeed, while there is no shocking difference in the value of the two properties actually involved here, the Dingus land acquired by Cornett was worth appreciably more than the Buchanan property and the Oates Cyphers lots which Cornett got in exchange. Cyphers had been in close and intimate touch and communication with Cornett up to the very morning of the Dingus trade, and there is little doubt that he knew he could exchange for the note the very property which Cornett that day accepted in exchange for the Dingus land. The face value of the note was more than the value of the property which he gave up in this exchange, and it seems a little strange, if he was really willing, as he says he was, to risk the note, that he did not sell direct to Cornett the property which the latter actually acquired in the exchange. Of course, Cyphers in fact made a still better trade, for the Dingus property was worth more than his, but the point is that Cyphers was an active real estate

dealer, he wanted to sell the Buchanan property, he could easily have sold it and the Oates Cyphers lot to Cornett for the note, and if he thought the note was a fair risk, this sale would have been an unmistakable bargain. Why then, if he had no advance information or understanding about the Dingus sale and the subsequent exchange, did he pass this bargain?

[2] Again, Cyphers was claiming to act as agent for Dingus, and while there was nothing inherently wrong in making the exchange, it seems hardly consistent with that confidential relationship to withhold from Dingus the fact (known to Cyphers before the Dingus deed was delivered) that he, and not Cornett, was to get the thirteen acres.

According to some of the witnesses, Cyphers had theretofore expressed himself as being afraid of the note, and had referred to Cornett on one occasion as a scoundrel, and on another as a slick duck. The witness, R. L. King, who happened to be present when Dingus delivered the deed, says that immediately after the delivery Cyphers said to Dingus: "These notes are absolutely gilt edge. I would not be afraid to risk one hundred cents to the dollar on them." Dingus corroborates King by saying that Cyphers told him the notes were good, both before and at the time the deed was delivered. Cyphers denies all this, as well as practically everything else that was said by any witness tending to sustain the theory of fraud and misrepresentation on his part, but in making these denials he has at least in one particular gone further than reasonable credulity can follow. He unqualifiedly and emphatically states that he never discussed the solvency of the Cornett note at all with Dingus until some hours after the trade was made, when Dingus had become dissatisfied and asked him to endorse the note; that the only time the notes were even mentioned between them was when Dingus asked him to help make the trade, and said he expected to get from Cornett a $2,000 note. It

is clear that Dingus knew almost nothing about Cornett; had never investigated the notes, and that all the negotiations with reference to this transaction had been confined to these three parties—Cornett, Dingus and Cyphers. The latter was a neighbor of Dingus, was a trader and a man of affairs, and it is hard to believe that Dingus, in the several conversations which these two men had in respect to probable sales of Dingus' land to Cornett, would not have asked Cyphers something about the probable value of the paper to be given in exchange. If Cyphers had said that he told Dingus he thought the notes were good, the statement would be consistent and reasonable, but as much can hardly be said for the statement which he does make in that respect and repeats more than once in his deposition.

[3] It is of course true that the burden of proof is on Dingus. The presumption is in favor of innocence and not of guilt, and one who charges fraud as a ground of relief must prove it by strong and clear and convincing evidence. This is especially true where, as here, the contract in question has been consummated by the delivery of a deed. These propositions are too well settled to require citation of authority in their support.

[4] The sole question in this case is whether Cyphers represented to Dingus that the notes were good, and thereby induced him to make the conveyance. Dingus says he did. Cyphers says he did not. If there were nothing else in the record, the case would be with Cyphers. It often happens, however, and it happens here, that the question of fraud depends as much upon circumstances as upon the statements of parties directly concerned. The mere fact that the oral testimony relating directly to the execution of a deed is equally balanced in point of the number of witnesses testifying for and against its fair execution does not necessarily mean that the attack must fail.

As was held in *Hale* v. *Hale,* 62 W. Va. 609, 59 S. E. 1056, 14 L. R. A. (N. S.) 221, when, in a suit by the grantor in a deed to set it aside for fraud in the procurement thereof, the oral evidence of the parties relating directly to the execution thereof is flatly contradictory and wholly irreconcilable, the circumstances bearing on the issue must be allowed unusual prominence and effect, and their controlling force depends more upon their character and power to create mental impression than upon their number and variety.

[5] In *Va. F. & M. Ins. Co.* v. *Hogue,* 105 Va. 355, 360, 54 S. E. 8, 10, this court, in an opinion by Judge Cardwell, approved the following general statement of the law as to the burden and requisite degree of proof in support of an allegation of fraud: "According to the overwhelming weight of authority, fraud need not, like the guilt of the accused in a criminal prosecution, be established beyond a reasonable doubt. A preponderance of evidence, as in any civil case, is sufficient, provided the proof is clear and strong enough to preponderate over the general and reasonable presumption that men are honest and do not ordinarily commit fraud, and reasonably to satisfy the understanding and conscience of the judge and jury. If it does this, it is sufficient both at law and in equity." (14 Am. & Eng. Ency. L., 200 and cases cited.)

[6] In view of the facts and circumstances above outlined and the rules of law applicable thereto, we are reasonably well satisfied that the decree complained of is right. To say the least of it, we are unable, after a thorough examination of all the evidence, to find enough in it to justify us in holding that the lower court was wrong. We sit as a court of review, the decree comes to us with a presumption of correctness, and we ought not to reverse it if we are not fully satisfied that it is wrong. *Reynolds* v. *Adams,* 125 Va. 295, 312, 99 S. E. 695; *Britton & Kennedy* v. *Terry, ante,* p. 34, 107 S. E. 687.

The record shows that the property conveyed to Moore, trustee, by Cyphers has been ordered sold in another suit, to satisfy certain of Cornett's creditors. The debts owned by these creditors, however, were in existence when the deed was made, and were not created upon the faith of that property. Cyphers was not a party to the suit in which the aforesaid decree of sale was made. Both suits are pending in the same court, and it is reasonable to expect that the restitution undertaken to be made by the decree complained of here can be worked out in such a way as to restore the parties in large measure to the former status.

*Affirmed.*